UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
NO. 13-1089


KIMBERLEE WILLIAMS, etc. et al.,
          Appellants
     v.

BASF CATALYSTS LLC; et al.



          Transcript from the audio recording of the oral argument held Thursday, March 13, 2014 at the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania.  This transcript was produced by James DeCrescenzo, a Fellow of the Academy of Professional Reporters, a Registered Diplomate Reporter, an Approved Reporter of the United States District Court.



BEFORE:

          THE HONORABLE THEODORE A. McKEE

          THE HONORABLE THOMAS L. AMBRO

          THE HONORABLE JULIO M. FUENTES

THIRD CIRCUIT, 3/13/2014

```
 1   APPEARANCES:

 2   JEFFREY M. POLLOCK, ESQUIRE
     jmpollock@foxrothschild.com
 3   FOX ROTHSCHILD
         997 Lenox Drive
 4       Princeton Pike Corporate Center
         Building 3
 5       Lawrenceville, New Jersey 08648
         609.895.7660
 6       Counsel for Appellants

 7

 8   EUGENE F. ASSAF, ESQUIRE
     eugene.assaf@kirkland.com
 9   KIRKLAND & ELLIS
         655 15th Street, N.W.
10       Suite 1200
         Washington, D.C. 20005
11       202.879.5196

12       And

13   KANNON K. SHANMUGAM, ESQUIRE
     kshanmugam@wc.com
14   WILLIAMS & CONNOLLY
         725 12th Street, N.W.
15       Washington, D.C. 20005
         202.434.5050
16
         And
17
     ERIC TUNIS, ESQUIRE
18   etunis@greenbaumlaw.com
     GREENBAUM, ROWE, SMITH & DAVIS
19       99 Wood Avenue South
         Iselin, New Jersey 08830
20       732.476.2676
         Counsel for Appellees
21

22

23

24
```

THIRD CIRCUIT, 3/13/2014

```
 1          THE COURT:  Good morning, everyone.
 2   This is the matter of Kimberlee Williams versus
 3   BASF, et al.  And I think you got a notice that we
 4   did expand the time.  This case has so many facets
 5   and nuances to it.  I don't usually ride the clock
 6   anyhow.  This is certainly not a case to be jumping
 7   on lawyers when the red light comes on, because
 8   there's so much we need to explore here.
 9          But just for example, as guidance, you
10   can use the 18 minutes for how you apportion your
11   time.  But don't be surprised if the red light goes
12   on and no one asks you to sit down, on both sides.
13   Ready to proceed?  It doesn't mean you should be
14   really long winded either.  I just thought of what
15   I just said to a group of lawyers.  My God.
16          MR. POLLOCK:  You can show me the hook
17   any time you want, Judge.
18          THE COURT:  Okay.
19          MR. POLLOCK:  May it please the Court,
20   my name is Jeff Pollock with Fox Rothschild.  I
21   appear here today with my co-counsel, Cohen,
22   Placitella & Roth, on behalf of appellants.
23          Your Honor is correct, we have at
24   least three or four weighty issues here.  One is
```

THIRD CIRCUIT, 3/13/2014

```
1   the Anti-Injunction Act.  One is --
2               THE COURT:  Can I just start with,
3   first of all, I guess basics, because I'm sort
4   of new to this, I just came in on it.
5               MR. POLLOCK:  Yes, your Honor.
6               THE COURT:  Why did you file in New
7   Jersey rather than -- you have five plaintiffs
8   from Ohio, one from New York.  What's the reason
9   for filing this particular action in New Jersey?
10              MR. POLLOCK:  Because BASF's
11  headquarters is in New Jersey.
12              THE COURT:  That's the only thing I
13  could think of.
14              MR. POLLOCK:  Yes, your Honor.
15              THE COURT:  But then you run into
16  the choice of law issue with regard to litigation
17  privilege, at least as to the common law claims.
18  And I guess the only common law claims that remain
19  are what, fraud and fraudulent concealment?
20              MR. POLLOCK:  Fraud and fraudulent
21  concealment, fraud upon the court.
22              THE COURT:  I thought fraud upon the
23  court you didn't --  you still --
24              MR. POLLOCK:  Fine.  We can do without
```

THIRD CIRCUIT, 3/13/2014

1   that one.

2              THE COURT:  Okay.  So fraud and

3   fraudulent concealment.

4              MR. POLLOCK:  Just the others.

5              THE COURT:  And you've got what

6   appears to be something fairly tough in New Jersey.

7   Maybe Ohio is different, at least the Northern

8   District of Ohio says it might be, some Ohio lower

9   court cases, state cases say that perhaps you do

10  have a, you know, a litigation privilege.  I don't

11  know what New York law is.

12             The choice of law thing only you

13  didn't bring up in the district court.

14             MR. POLLOCK:  The choice of law

15  thing was not brought up in the district court.

16  The opinion below did raise it in a footnote and

17  said hey, if this thing goes back down or has to

18  continue there will be briefing on it but it did

19  not decide the issue, it was not briefed.

20             THE COURT:  But that may not spare --

21  if there is a waiver, that footnote may not spare a

22  waiver.

23             THE COURT:  Yes, the district court

24  dealing with it doesn't mean that you dealt with

THIRD CIRCUIT, 3/13/2014

```
 1   it.
 2              MR. POLLOCK:  Correct.
 3              THE COURT:  If -- and then the
 4   question is can you waive choice of law.  And Lord
 5   knows we're all over the ballpark in our circuit.
 6   You've got a '44 case that says you can't.  That
 7   was by, Judge Maris was on the panel; we're in his
 8   courtroom.  You've got a '58 case, Parkway Baking,
 9   that says you can't.  Then you've got a '95 case en
10   banc in Neely which makes the statement that you
11   can, although I don't think it's a holding.
12              So, but I guess maybe my first
13   question to you is why can't you waive a choice of
14   law analysis?
15              MR. POLLOCK:  Your Honor, I have to
16   admit, I'm ready for the other four.  On the choice
17   of law issue I had not really thought that through.
18   I recognize the court at this point had not ruled
19   upon it.
20              And so if you're asking me the
21   question, and I just want to understand the court's
22   question, is the question under the New Jersey
23   litigation privilege, does that bind all parties?
24              THE COURT:  We're not at New Jersey
```

THIRD CIRCUIT, 3/13/2014

1  yet.

2           THE COURT:  Certainly BASF.

3           MR. POLLOCK:  I'm sorry?

4           THE COURT:  Because the choice of

5  law question may go to whether or not the Jersey

6  litigation privilege is the privilege, if there is

7  one, that controls, where if it's not New Jersey

8  law that controls.

9           MR. POLLOCK:  Well, certainly as to

10 BASF I would argue that New Jersey law would govern

11 because they're, BASF --

12           THE COURT:  But the judicial

13 proceedings we're talking about were in Ohio and

14 New York.

15           MR. POLLOCK:  They were, but they

16 have independent tort claims under spoliation which

17 were never litigated before.  And those claims,

18 there's no reason they couldn't bring them now in

19 New Jersey.  That's part of our class action.  They

20 were unaware of this before, there is no reason

21 they cannot now bring this claim here in New

22 Jersey.  So why would that not be properly subject

23 to New Jersey law and in a New Jersey court?

24           THE COURT:  Well, why would it?

THIRD CIRCUIT, 3/13/2014

1  The fact the claim was brought in New Jersey, you

2  look to then New Jersey choice of law rules.  And

3  I don't know that New Jersey choice of law rules

4  would require New Jersey law to be applied to that.

5  Maybe Ohio law, maybe Ohio and New York depending

6  on the plaintiff.

7            MR. POLLOCK:  Well, New Jersey's

8  government -- New Jersey, as you know under -- and

9  I have to admit I didn't prepare that part of the

10 agreement but I know the area pretty well because I

11 do a lot of insurance litigation.

12            New Jersey looks to the governmental

13 interest test.  It no longer looks to lex loci

14 delicti, any of the -- and so in this case I

15 believe what they would say is where did the

16 actions take --

17            THE COURT:  You're talking about

18 choice of law now?

19            MR. POLLOCK:  Yes, sir.

20            THE COURT:  Is that the same thing --

21 I thought New Jersey followed restatement 148 and

22 section six which is the substantial relationship

23 test.

24            THE COURT:  Which may be the same

THIRD CIRCUIT, 3/13/2014

```
 1  thing in this case.
 2              MR. POLLOCK:  My recollection from
 3  the insurance case, whose name I'm not -- because
 4  again I wasn't prepared on this one, the insurance
 5  case arises out of Trenton, New Jersey where the
 6  car accident occurs in New York.  They looked to
 7  the governmental interest test of which case had
 8  the most substantial relationship, you're correct.
 9              THE COURT:  Okay.
10              MR. POLLOCK:  But they also were
11  using the governmental interest analysis.  Does
12  the New Jersey forum have a significant interest.
13              THE COURT:  Didn't Judge Chesler
14  address the choice of law issue?  I thought he had
15  said something in his opinion.
16              MR. POLLOCK:  He did.  He said I have
17  not decided it yet.  It hasn't been brought to me
18  yet, and that the issue could be a briefing frenzy,
19  I think he uses a different word, but it would be a
20  briefing battle between what would be the choice of
21  law.  So that issue he does identify but he doesn't
22  address it.
23              THE COURT:  And there might have to be
24  some discovery.
```

JAMES DeCRESCENZO REPORTING, LLC

THIRD CIRCUIT, 3/13/2014

1        MR. POLLOCK:  Correct.

2        THE COURT:  Do you know if there is --

3  you say you haven't really worked on this issue.

4  Do you know if there's a conflict in the laws, I

5  mean on the privilege issue?

6        MR. POLLOCK:  I honestly don't.  Judge

7  Fuentes, that's a good question.  That is one of

8  the first questions the courts in New Jersey ask.

9  I don't know the answer.  Because I don't know on

10  this issue with regard to litigation privilege

11  whether there is a distinction between the two.

12        And I think that, frankly, even if

13  we take the New Jersey litigation privilege at

14  its broadest, I think the answer is that I would

15  be shocked and surprised if the actions that are

16  identified, which is identified squarely in

17  footnote eight of our moving brief, and identified

18  in our pleadings, would fall within litigation

19  privilege in any jurisdiction.

20        So I haven't looked at Ohio law on

21  this issue, but I doubt that Ohio is going to say

22  it's okay to take evidence and destroy it and to

23  lie about it in a conspiracy.  That's separate than

24  actually representing it to the court.  So to me I

THIRD CIRCUIT, 3/13/2014

 1  don't know, Judge Ambro, whether there is a

 2  conflict to respond to Judge Fuentes's question but

 3  my guess is --

 4            THE COURT:  Maybe it's an issue that

 5  we ask for supplemental briefing because I think

 6  you only dealt with it on pages 22 and 23 of your

 7  brief in note seven.  BASF had a long footnote on

 8  page 40, I think it's note six.

 9            MR. POLLOCK:  Yes, sir.

10            THE COURT:  And then the Cahill Gordon

11  brief was a sentence or two on, toward the end on

12  page 53 on note 12.  And yet to me it's a fairly

13  significant issue, or could be, possibly could be.

14            MR. POLLOCK:  Judge, do you mind if I

15  drill down on this for a second?

16            THE COURT:  Sure.

17            MR. POLLOCK:  And this will help all

18  counsel if you want supplemental briefing.

19            The issue that you're concerned about

20  with regard to the choice of law is whether the

21  litigation privilege --

22            THE COURT:  Is different in Ohio than

23  it is in New Jersey.

24            MR. POLLOCK:  Fair enough.

THIRD CIRCUIT, 3/13/2014

1  Understood.

2  THE COURT:  No court has held

3  that statements that are considered fraudulent

4  statements would be entitled to the litigation

5  privilege.  Is that accurate?  No court, to your

6  knowledge, no state court in the country has ever

7  held that a fraudulent statement would be entitled

8  to the litigation privilege.

9  THE COURT:  If you know.

10  MR. POLLOCK:  That a fraudulent

11  statement is covered, no.  Have the courts,

12  including Loigman, for example, in New Jersey, said

13  that a potentially bad apple, a false pleading --

14  THE COURT:  That talks about

15  defamation though.  That's a little --

16  MR. POLLOCK:  It does.

17  THE COURT:  A little different.

18  MR. POLLOCK:  And actually I would

19  even give the devil its due and say Loigman goes

20  a little bit farther.  Because if you take -- we're

21  jumping out of turn, if you don't mind, Judge

22  Fuentes, I'll just jump in right at this point.

23  In Loigman what happened was, and

24  that's the most recent word from the New Jersey

THIRD CIRCUIT, 3/13/2014

1  Supreme Court, so that's obviously where I focused,

2  Judge Fuentes, Mr. Loigman is a local gadfly is a

3  political guy, he wants to follow, and the local

4  town counsel, Mr. Savage, who has since passed

5  away, files an arguably false pleading.

6          The court doesn't really get into it

7  but let's assume it was a false pleading, that the

8  guy wasn't really a witness, Mr. Loigman, and that

9  the basis for him being kicked out was just because

10 he was annoying, which I think is what the case

11 was.

12          The court uses -- in that case it

13 couples it with Hartman which is the earlier

14 decision by the Supreme Court.  And as Judge Albin

15 points out in Loigman -- it's as directly as you

16 pointed out, Judge Fuentes -- that the question in

17 the litigation privilege, which, and Judge Albin

18 goes back to the 1500s, it arises out of speech.

19          And New Jersey, and I'll give the

20 devil its due, has even gone farther and said it

21 works in arbitration, it works in pretrial filings,

22 it works in pleadings potentially even.

23          THE COURT:  It really announced, it

24 seemed to me, a very, very broad principle when

THIRD CIRCUIT, 3/13/2014

1   that court says, I'm just going to look at the

2   statement from that court.

3               MR. POLLOCK:  Yes.

4               THE COURT:  Litigation privilege

5   generally protects an attorney from civil liability

6   arising from words he has uttered in the course of

7   judicial proceedings.

8               MR. POLLOCK:  Absolutely, words he has

9   uttered --

10              THE COURT:  From words he has uttered.

11              THE COURT:  Even if they're threats in

12  Ruberton.

13              THE COURT:  Yes.

14              MR. POLLOCK:  That's right.  So

15  I think we're faced with a spectrum here.  And

16  the spectrum here is as follows:  You've got a

17  misrepresentation.  I misrepresent something to

18  you.  In fact there is some judge that says that

19  fraud is acceptable and I just don't know about it.

20  Okay?  I'm not -- you can sanction me, you can

21  discipline me, but you can't sue me.

22              You've got Loigman where the guy

23  actually makes a false pleading potentially to keep

24  somebody -- Savage keeps him out.

THIRD CIRCUIT, 3/13/2014

```
 1            The question is is there a line?  And
 2  I think the answer is there is.  The line would be
 3  is it okay to take evidence and destroy it?  To
 4  talk about it --
 5            THE COURT:  Well that's different.
 6  We're talking about fraud and you're talking about
 7  spoliation.
 8            MR. POLLOCK:  Well, the question here
 9  was fraud upon -- was the litigation privilege, how
10  broad is the litigation privilege.  The litigation
11  privilege may, it may address the individual
12  representation by an individual, but does it really
13  go so far as to say if I collect evidence as part
14  of a plan, a conspiracy, because now you've got New
15  Jersey RICO triggered.  Let's assume for the sake
16  of argument it is.  That it is inappropriate for a
17  lawyer and a company to conspire to collect
18  evidence, destroy it and deceive the court.
19            You've got RICO, which is a remedial
20  statute, incredibly broad, and you've got the
21  litigation privilege saying an individual
22  representation, even if it's potentially wrong or
23  false, a few bad apples, as Judge Albin in essence
24  says, gets away.  Those two issues are in conflict.
```

THIRD CIRCUIT, 3/13/2014

```
 1            There has got to be a line where the
 2  conduct, for example, of collecting that evidence
 3  and conspiring about it, because otherwise it will
 4  be open season on the courts.  What people would
 5  say, and Atlas clearly points out, there is some
 6  point where the equitable power of this court to
 7  stop fraud does step in.
 8            And so to me the question that's right
 9  here is that that individual statement perhaps, and
10  so to use our example, let's assume BASF --
11            THE COURT:  Why can't the lawyers
12  say there is no asbestos in our talc product in
13  the course of litigation, in the course of
14  discovery, and why can't he say that?  And if he
15  says it why isn't he entitled to the litigation
16  privilege because they are words uttered in the
17  course of litigation?
18            MR. POLLOCK:  I think to put a fine
19  point on it --
20            THE COURT:  It's separate from the
21  spoliation issue that you were discussing before.
22            MR. POLLOCK:  I think they're
23  intertwined and here's how I think they're
24  intertwined.
```

1          If BASF and Cahill Gordon have a

2   case in Wichita, Kansas and they have a guy, they

3   hire local counsel and they say John, there's no

4   asbestos in our talc, file a motion to dismiss.

5   John walks in and files a motion to dismiss.

6          I agree with you he is absolutely

7   immune under the litigation privilege.  Whether

8   that statement is false or not, he is protected

9   because he believes it to be true, et cetera.

10          THE COURT:  Well, that's the key.

11  You're putting a rabbit in the hat with this

12  hypothetical.  The issue here is -- because that's

13  not even fraud because there's no scienter.

14          MR. POLLOCK:  Exactly right.  So now,

15  and Judge, Chief Judge McKee, what I was going to

16  is then take the next step.  Is it a difference

17  that makes a difference if Cahill Gordon walks in,

18  knowing that it was false, because now you've got

19  the action of conspiracy and you've got the

20  statement.  Is that a difference that makes a

21  difference?

22          The litigation privilege under Loigman

23  says hey, as to that individual representation

24  maybe it's not a problem, I can go ahead and lie

THIRD CIRCUIT, 3/13/2014

1   to the court, you can disbar me, you can sanction

2   me, but you can't sue me.

3           But is it a difference that makes

4   a difference that it's now part and parcel of an

5   action, that it is a discussion that they had with

6   Cahill Gordon, with BASF to collect evidence,

7   destroy it, lie about its existence, file false

8   pleadings?

9           Now in the other context, filing a

10  false pleading, making a false statement, I'll

11  agree with you, Judge Fuentes, those individual

12  statements are okay.  But there is no indication

13  that the New Jersey Supreme Court went that far as

14  to protect actions.  And every other case in New

15  Jersey, including Loigman, goes back and traces the

16  history to the 1500s, where they're talking about

17  speech, representation.

18          THE COURT:  Can I get your point?

19  Maybe I missed something.  So you say the making

20  of the statement is okay under Loigman, but the

21  destruction of evidence, the physical destruction

22  of evidence is not.  Was that your statement?

23          MR. POLLOCK:  I think that the --

24  respectfully, I think we're talking past each other

THIRD CIRCUIT, 3/13/2014

1  and perhaps I'm just being dense.

2          Your question tries to put me into a

3  box and say there's either statements or there's

4  actions.  And my answer is --

5          THE COURT:  They are your causes of

6  action.

7          MR. POLLOCK:  They are, but the

8  question --

9          THE COURT:  Isn't spoliation a cause

10  of action?

11          MR. POLLOCK:  It is, your Honor,

12  it's an independent tort.  But I was addressing

13  a separate question, which is the litigation

14  privilege, how, because that's where we started off

15  with, how broad is the litigation privilege.  And

16  my point simply is that there is no evidence that

17  the New Jersey Supreme Court in Loigman accepted

18  the proposition that actions such as those taken in

19  conjunct with words are okay.

20          For example, make it simple, I shoot

21  an adverse witness.  Clearly I'm going to be liable

22  for that even though I'm doing it in the name of my

23  client.  I've got to be liable for it.  So there

24  are limits to what I can do.

THIRD CIRCUIT, 3/13/2014

```
 1              In this case the question of course
 2   is did the New Jersey Supreme Court really mean to
 3   say it's okay to have a conspiracy to have this
 4   whole big principle of a remedial statute, RICO --
 5   we're going to have a whole industry now of lawyers
 6   and companies conspiring to destroy the court
 7   system.
 8              THE COURT:  Do you think that there
 9   are policy implications in this issue, that is
10   that lawyers can make fraudulent statements in the
11   course of litigation?  Do you think it's okay to
12   do it or do you think there are policy implications
13   against it?  I mean does that aid litigation?  Does
14   it deter bringing cases to a final just and fair
15   result?
16              MR. POLLOCK:  To be quite honest
17   with you, Judge, I see both sides of the coin,
18   because the purpose behind the breadth in Judge
19   Albin's decision is that we do not want witnesses
20   to be chilled when they walk up to the stand to
21   give their truth.  We do not want lawyers to be
22   worried about giving their truth.  I get it.
23              And therefore, if someone overstates,
24   hyperbole, even misrepresents, the court says we
```

THIRD CIRCUIT, 3/13/2014

1  don't want that chilled in the name of legitimate

2  advocacy.  I completely accept that proposition.

3           And the court then goes on and says

4  in the section you just cited to me, that there

5  may be some people who overstep, who actually

6  misrepresent, and perhaps they get away with it.

7  Doesn't mean we can't do something to them but we

8  can't sue them.

9           This is different.  Because here

10 it's the action conjoined with actual words, that

11 they didn't just independently walk in and make a

12 statement.  It wasn't like Mr. Savage walking in,

13 making a filing and saying get this jerk out of

14 here.

15          This is a plot ahead of time to

16 collect evidence, destroy it, benefit from it,

17 and that is a conspiracy.  That is New Jersey

18 RICO.  That's our pleading.  And then we get to

19 the question of is that statement what was intended

20 to be covered by the litigation privilege.  And I

21 respectfully submit that is in no way what the New

22 Jersey Supreme Court contemplated.

23          The individual statement is fine,

24 and that's why I drew, Chief Judge McKee, the

THIRD CIRCUIT, 3/13/2014

1   difference between the individual guy, John in

2   Wichita, Kansas, and BASF Cahill Gordon conspiring.

3   I think that's a difference that makes a

4   difference.  It's a difference that makes a

5   difference, it should make a difference to this

6   court, because otherwise it could be open season on

7   this court as well.

8               THE COURT:  So the, of the two claims

9   that remain, what is the fraud claim and how is it

10  different from the fraudulent concealment claim?

11              MR. POLLOCK:  The fraud claim is

12  that they deceived plaintiffs by virtue of, like

13  Williams, for example, by destroying evidence,

14  hiding the existence of that evidence and forcing

15  those people to litigate cases.  And the same thing

16  with the client in New York.  That they filed a

17  false and misleading statement by fraud,

18  intentional, knowing misrepresentation with the

19  intent for the other to rely upon it.  That claim

20  is in essence their fraud claim.

21              THE COURT:  I'm sorry, just to

22  clarify, I meant of the common law claims that

23  remain, it's fraud and fraudulent concealment.

24  The fraudulent concealment is what, the action of,

1  purported action of Mr. Hemstock after the Westfall

2  settlement to take everything, put it together and

3  ostensibly to destroy it?

4           MR. POLLOCK:  That's right, to deep

5  six the evidence, put it in a warehouse and not

6  tell us about it.

7           THE COURT:  The district court said in

8  connection with that, if I'm not mistaken, that you

9  didn't show if you had that evidence that you would

10  have a better claim.

11           MR. POLLOCK:  And respectfully on

12  that --

13           THE COURT:  I'm sorry, or that you

14  would have had a claim at all.

15           MR. POLLOCK:  Right.  I think this is

16  where Iqbal and Twombly kicks in.  Because as I see

17  Iqbal and Twombly, they are part and parcel to be

18  read commensurate with the well pleaded complaint

19  rule, not in violation of it.

20           And in this case we did plead in

21  detail that Williams would have not dismissed,

22  Williams would have litigated this claim had she

23  known the facts.

24           Same thing with the case in New York,

1  they pled, and the record, which I think the court,

2  the opinion below failed to consider, we have proof

3  in our appendix that goes through and says we,

4  BASF, Cahill Gordon are representing to you there's

5  no asbestos in the talc, rely upon this.

6            That's part of the proofs.  The other

7  side of the proofs are people actually saying we

8  are dismissing based upon that representation.

9            And so to me what the court asked me

10 here to do in its opinion is to say prove that it

11 would have made a difference.  Well the problem is

12 I can't -- it's kind of a Catch-22, I don't have --

13 what I know is we lost, we dismissed the case in

14 those two matters on the basis there was a

15 representation there was no asbestos in the talc.

16            Would it have made a difference

17 if there was asbestos in the talc?  What am I

18 supposed -- to me the court's creating -- we've

19 pled that it made a difference.  So under the well

20 pleaded complaint rule we have pled a proper cause

21 of action.

22            THE COURT:  And the causation seems

23 almost endemic in the pleadings.  I mean if you lay

24 out A, B, C and D, if the formula is A, B, C, if

THIRD CIRCUIT, 3/13/2014

1   you have A and B and C you also have D.

2              MR. POLLOCK:  Correct.

3              THE COURT:  If that's taken as the

4   premise, and you plead you have A and you have B

5   and you have C, the fact that you're not, may not

6   lay out and therefore I have D, just seems, I don't

7   know what other inference could be drawn from the

8   allegations that you do plead other than the

9   causation element, and the court said it was

10  lacking.

11             MR. POLLOCK:  But isn't the simplest

12  analysis of this we had to prove there was asbestos

13  in their talc, we had someone who was dying of

14  mesothelioma, they've worked at a place where

15  asbestos is present, and now the question is can

16  we prove it's your asbestos and there was asbestos

17  present in your product.  And we're missing that

18  one --

19             THE COURT:  How many of these six

20  suits actually related to the Johnson Vermont mine?

21  Do you know?

22             MR. POLLOCK:  I believe all of them.

23             THE COURT:  All of them?  Okay.

24             MR. POLLOCK:  But to me one of the

THIRD CIRCUIT, 3/13/2014

1  fundamental pieces, building blocks we had to

2  prove, the reason -- we clearly have somebody whose

3  dying because they died.  We have someone who got

4  mesothelioma.  That was pretty easy to prove.

5           The part we couldn't prove, because we

6  had -- think about it from this perspective.  The

7  mine is flooded so we cannot go back.  If we had

8  gone in the way-back machine, we can't go get the

9  asbestos proofs that were there in 1958, '59, '60,

10  '61.  They don't exist any more.  So we can't go

11  back and sample the air.

12           We do have someone who has an

13  admission against interest, them, because they

14  had Royal Insurance Company and others who were

15  monitoring the mine, who were monitoring the

16  facility, and they have proof that there -- and

17  they actually had proof themselves, which would

18  have been palpable proof there was asbestos in

19  their talc and we could have then said to the jury,

20  hey, there was asbestos in their talc and that is

21  what caused this problem.

22           The building block that we were

23  missing was the asbestos in the talc part because

24  they had collected it and destroyed it.  And that

THIRD CIRCUIT, 3/13/2014

1  to me is, I found a very straightforward proof.

2              THE COURT:  What you did have was the

3  2009 deposition of Mr. Paduano, right?

4              MR. POLLOCK:  Yes, your Honor.  Should

5  I move on to New Jersey RICO, Judge?

6              THE COURT:  What about the

7  Anti-Injunction Act?  Can we deal with that?

8              THE COURT:  Yes, spend some time on

9  that and then do the RICO thing.

10             MR. POLLOCK:  Sure, that's easy.

11             THE COURT:  It seems like the first

12 thing that you're only, the relief that you request

13 there really applies only to BASF and not to Cahill

14 Gordon on the Anti-Injunction Act.

15             MR. POLLOCK:  I disagree, your Honor,

16 respectfully.  The --

17             THE COURT:  If you reopen the asbestos

18 lawsuits, I'm just thinking practically, Cahill

19 Gordon wouldn't be a defendant.

20             MR. POLLOCK:  Well, I think that's

21 probably a good place to start.  In the opinion,

22 the court states that we sought to refile

23 complaints, we sought to invalidate state court

24 proceedings, we sought to alter stay.  We never

THIRD CIRCUIT, 3/13/2014

1  sought any such relief.  That's at 396 and 397

2  of the record.

3              THE COURT:  But what you're asking

4  for is if you were to go to back to Ohio and New

5  York and seek to reopen, they can't bring up res

6  judicata or any type of preclusion doctrine.

7              MR. POLLOCK:  And on that one, your

8  Honor, we are torn because it's possible that that

9  would violate the Anti-Injunction Act under

10  Atlantic Coast.  But if you don't mind for a

11  moment, Judge Ambro, can I approach it from a

12  different angle?

13              THE COURT:  Sure.

14              MR. POLLOCK:  The simplest form of

15  relief would be if a class is certified, of people,

16  a class of those people who were, had asbestos

17  claims against BASF, where those claims were

18  litigated without knowledge of the fraud, all

19  right?  So let's assume that's the class.  We can

20  define it more classily, but let's assume that's

21  the class.

22              Isn't the simplest form of relief that

23  is unquestionable and does not violate Atlantic

24  Coast, simply to give them notice that a class has

1  been certified?

2        THE COURT:  I thought that -- I have a

3  misunderstanding.

4        THE COURT:  I misunderstood that too.

5        THE COURT:  What is it that you are

6  seeking to enjoin?  What is it you asked the

7  district court to enjoin?

8        MR. POLLOCK:  We didn't ask the

9  district court to enjoin anything.  Let me restate

10 that.  We did ask the court a number of different

11 things.  We asked them to enjoin BASF from making

12 false pleadings.  We asked them to enjoin BASF from

13 making false statements, misrepresentations.  But

14 Judge Fuentes --

15        THE COURT:  Res judicata.  Didn't you

16 enjoin them from -- ask to enjoin the defense of

17 res judicata being asserted?

18        MR. POLLOCK:  We did.  And to me, if

19 I -- the question before this court, I believe, is,

20 is there no reasonable possibility, no reasonable

21 plausibility of an amended complaint, a third

22 amended complaint that would pass muster?  And my

23 answer is there is.  Because if I asked --

24        THE COURT:  Pass muster under what

THIRD CIRCUIT, 3/13/2014

1  now, Anti-Injunction Act you're still talking

2  about?

3              MR. POLLOCK:  Yes, under the

4  Anti-Injunction Act, yes, your Honor.  And the

5  simplest one is notice.  Notice cannot conceivably

6  violate any state court ruling.  Nonspoliation

7  can't conceivably violate any state court action.

8  Because all I'm doing is saying preserve the

9  records.  But certainly notice alone is a

10  substantive and procedural right.

11              There is no reason that if we ask for

12  notice alone, and all I have to do is prove one in

13  order to get that.

14              THE COURT:  What do you mean by --

15              THE COURT:  Yeah, I'm not sure either.

16              THE COURT:  What do you mean by

17  notice?

18              MR. POLLOCK:  Notice, one of the

19  things we would ask is that if the class is in

20  fact certified, that notice be sent at defendant's

21  expense, which the Supreme Court has said is okay,

22  after the class is certified, that a class has been

23  certified.  And this class is those people who had

24  a claim against BASF and relied upon, or relied

THIRD CIRCUIT, 3/13/2014

1  upon the representation there is no asbestos in the

2  talc.

3            THE COURT:  I don't know how that

4  would help you, because then you're still stuck

5  with these judgments.  Unless you can do something

6  to get these judgments out of the way there's the

7  defense of res judicata, and it seems to me you've

8  got to ask for that defense to be enjoined from

9  being raised and that brings you right under the

10  Anti-Injunction Act.

11            MR. POLLOCK:  Because we're not

12  telling any state court what to do.  And there are

13  some states, I believe Oklahoma is one if I have it

14  right, where in fact if I get a corrupt judgment, I

15  lie and I cheat and I get my judgment, I can't

16  reopen it no matter what.  I get it.  There are

17  some places where there's nothing I can do.

18            But there are other jurisdictions,

19  such as New Jersey for example, where if I obtain a

20  judgment by fraud I can make an application.  I am

21  not telling any lawyer what to do, I am not telling

22  any judge what to do.  I am not violating Atlantic

23  Coast because I'm not telling anybody what to do.

24  But I can certainly -- they have a substantive

THIRD CIRCUIT, 3/13/2014

1   right to know you have a spoliation claim --

2              THE COURT:  Wait.  How are you not

3   telling them what to do?  You're asking a court to

4   preclude them from doing something when you get an

5   order saying to them you cannot raise res judicata

6   in a defense.

7              MR. POLLOCK:  Right.  And so to me if

8   that one oversteps, your Honor, then we'll strike

9   it.  But I'm focusing, respectfully, on those that

10  I absolutely can ask for.  So let's assume --

11             THE COURT:  So you no longer want to

12  preclude any of the defenses that it seemed that

13  you were seeking to preclude before.

14             MR. POLLOCK:  We were seeking that

15  relief.  But right now I guess, and I apologize

16  that I'm not addressing the court's question, one,

17  I'm focusing on those that we should be able to ask

18  for.

19             THE COURT:  So all you want to do is

20  give notice to litigants who --

21             MR. POLLOCK:  Get an order of

22  nonspoliation would be one.  Why would an order

23  of nonspoliation -- one of the allegations here

24  is that they had evidence, have a history of

THIRD CIRCUIT, 3/13/2014

1  destroying it.  There is no interference with the

2  state court action if we ask that they collect the

3  evidence and maintain it.

4            This court routinely requires that in

5  every Superfund case I've ever been in.  You've got

6  to keep that evidence and maintain it for a long

7  time.  The court --

8            THE COURT:  They have to do that in

9  your case, don't they?

10           MR. POLLOCK:  I'm sorry?

11           THE COURT:  They had that obligation

12 anyway in regard to your case.

13           MR. POLLOCK:  They would.  But to me

14 the, for some of these plaintiffs, and I recognize

15 there are some outlier courts where fraudulent

16 judgments apparently are legitimately obtained

17 after some period of time.  There are others where

18 those courts -- having spoliation, there would be a

19 substantive right to actually get notice.

20           I'm not telling the state court to

21 reopen the action, I'm not telling the state court

22 that, to consider, don't consider affirmative

23 pleadings.  All I want to do right now is say, get

24 notice, and have a simple order that says do not

THIRD CIRCUIT, 3/13/2014

1   destroy evidence and keep and maintain it.

2                   THE COURT:  I thought it's already

3   gone.  Isn't the evidence already destroyed?

4                   MR. POLLOCK:  No.

5                   THE COURT:  According to your

6   allegation.

7                   MR. POLLOCK:  There is some evidence

8   that's destroyed, there's evidence that's not.

9   Some of it, for example, in Paduano popped up the

10  last minute.  We've been advised that there's a

11  warehouse of stuff, whatever that stuff is.

12                  THE COURT:  So the injunction that

13  you are now seeking is to enjoin the parties from

14  destroying any evidence currently in their

15  possession?

16                  MR. POLLOCK:  Yes, your Honor.

17                  THE COURT:  But you haven't made that

18  application to the district court, have you?

19                  MR. POLLOCK:  We did.  We asked for a

20  trust, we called it, it's a record repository, we

21  did ask for that.  It's in our prayer for relief.

22  We also asked for notice.

23                  THE COURT:  Is your appeal from a

24  denial of that order?

THIRD CIRCUIT, 3/13/2014

```
1          MR. POLLOCK:  There is -- this is the
2   appeal because the entire matter -- well, there was
3   one decision, the matter was dismissed on the
4   pleading stage so there was no independent appeal.
5          THE COURT:  Yes, but Judge Fuentes'
6   question is a good one because if what you're
7   asking for now is not something the district court
8   had an opportunity to evaluate and consider and
9   it's not included within the scope of the district
10  court's judgment, then I'm not sure we can get to
11  that.
12          MR. POLLOCK:  Bear with me for one
13  second.  In our demand for relief -- bear with me
14  here -- we ask for a notice program, that's at 1934
15  paragraph D.
16          THE COURT:  Whereabouts are you?
17          MR. POLLOCK:  I'm looking at record
18  1934, page 1934, paragraph D, demand for relief,
19  it's page 169.  And we actually asked for a
20  maintenance of a perpetual trust for -- this is
21  paragraph E, an injunction requiring BASF and
22  Cahill to jointly and severally fund the
23  maintenance of an independent trust, we called it,
24  it's a record repository, for locating, collecting,
```

THIRD CIRCUIT, 3/13/2014

1 housing, archiving, making available BASF's

2 asbestos materials.

3          So we did ask specifically for that

4 relief.  There's nothing that violates any state

5 court right in that regard.  So we don't violate

6 Atlantic Coast.

7          If those two forms of relief, and

8 they may be improperly worded, and I will concede

9 that there's other parts of the complaint that are

10 overly broad and that arguably intrude upon a state

11 court right, but I think the question before this

12 court is is there no plausible cause of action that

13 we have stated that upon remand on a third amended

14 complaint we couldn't get it right?

15          And the answer is yes, because clearly

16 notice does not violate Atlantic Coast.  Requiring

17 them to keep and maintain records does not violate

18 Atlantic Coast, it doesn't tell a single state

19 court what to do.  And we do have an independent

20 state cause of action, spoliation, which I

21 recognize in the choice of law question Judge Ambro

22 raises there's no reason that matter is not ripe

23 and alive today.

24          THE COURT:  What about the declaration

THIRD CIRCUIT, 3/13/2014

1  for fraud?  Does that -- I thought you basically

2  had a two-barreled approach.  Part of it was the

3  declaratory judgment, that they couldn't assert

4  certain defenses.  And that seems very problematic,

5  and I'm not trying to box you into anything but I

6  get from what you're saying that you concede there

7  are some problems there.

8                   But whether or not those problems

9  are so weighty as to cause you to lose I'm not

10 suggesting one way or another.  But there's some

11 problems there that may not be there if you look at

12 it in terms of a declaration that fraud was, that

13 fraud was involved.  You're not pushing that one.

14                   MR. POLLOCK:  Our theory on fraud,

15 your Honor, was that these people could not

16 maintain that cause of action because they didn't

17 realize the fraud had existed.  Therefore the cause

18 of action was not litigated before.

19                   THE COURT:  Well that's -- but you've

20 got judgments.

21                   MR. POLLOCK:  We do.

22                   THE COURT:  And I don't know how

23 that is not -- you're trying to box it into the

24 relitigation exception and I'm not sure that that

1  round peg fits into that one.

2           MR. POLLOCK:  And I agree with you,

3  your Honor, because under Chick Kam Choo I've got

4  a problem on the relitigation exception because it

5  was not a matter adjudicated.  I recognize that.

6  So perhaps we cannot plead around that one.

7           But to me the question again is the

8  court here dismissed at the pleading stage saying

9  there is no conceivable cause of action for an

10  outrageous course of conduct that we can take here.

11  And I think the answer is no.  There is substantive

12  relief that can be granted.  What exactly that

13  relief is, frankly I would like to have, if we get

14  past the other hurdles we have today, I would like

15  to have the opportunity to replead in a third

16  amended complaint.

17           But I think clearly I've demonstrated

18  there's two causes of action that we could see that

19  are substantive rights, notice to the parties, and

20  also the formation of a record repository.  If

21  those reliefs alone were granted that would

22  significantly advance the cause that plaintiffs

23  want to seek.

24           THE COURT:  What is the notice that

THIRD CIRCUIT, 3/13/2014

```
 1  you want the parties to have?
 2              MR. POLLOCK:  I want the parties to
 3  have notice.
 4              THE COURT:  Of?
 5              MR. POLLOCK:  That there was a class
 6  action certified and that the class, and I may
 7  frame it differently later on but this would be the
 8  idea, of those people who had claims against BASF,
 9  who relied, or who were told by BASF that there was
10  no asbestos in the talc, and relied to their
11  detriment upon that statement.
12              Why shouldn't those people be
13  notified?  Chief Judge McKee is right.  There are
14  some places where the court may say tough luck,
15  it's too bad, so sad, you can't do anything about
16  it now.  There are other places where it may not.
17  But certainly it is a substantive and procedural
18  right for them to get notice that this event
19  occurred because it was something they were not
20  aware of.
21              And second of all, for those people
22  who want to pursue, who have ongoing claims, and
23  there several, including a number in New Jersey,
24  having the formation and preservation of the
```

1   records that BASF and Cahill Gordon have a history

2   of destroying those records, that is a substantive

3   right too.

4              THE COURT:  Maybe in your time you

5   have RICO.

6              MR. POLLOCK:  Talk about New Jersey

7   RICO briefly.  On New Jersey RICO the trial court

8   found that under Cetel vs. --

9              THE COURT:  We know what they found.

10  How is it wrong?  How is the court wrong?

11             MR. POLLOCK:  Because the answer is

12  Cetel vs. Kirwan and Ball only stands for a limited

13  proposition, that for the purposes of statute of

14  limitations alone, that's the only one, that the

15  statute, that the New Jersey RICO and the federal

16  RICO are coterminous.

17             When we look at Ball itself, for

18  example, the section that the court didn't cite is

19  the very section that points out that New Jersey is

20  broader.  New Jersey, for example, has gone through

21  and said that it uses the word incidents not acts.

22             It uses -- it specifically, and this

23  is at 141 NJ 166.  It specifically goes on and says

24  that the legislature of New Jersey sat down and

THIRD CIRCUIT, 3/13/2014

1  discussed what's an enterprise?  And they rejected

2  expressly the narrow limitation that the federal

3  law puts in that we only want to have the Mafia and

4  Mafia like groups.

5           They wanted to have broader things so

6  they defined enterprise differently, 141 NJ at 161.

7  They also specifically went on and said and we want

8  to make sure that other people are included and

9  therefore New Jersey RICO, unlike federal RICO,

10  does not require the participants have operation or

11  management responsibilities, 141 at 175.

12           The second big question --

13           THE COURT:  Is there any case that

14  you can give us that extends New Jersey RICO to

15  this type of claim?

16           MR. POLLOCK:  No.  There's also,

17  respectfully, your Honor, no case that does not.

18  And so the answer is the New Jersey Supreme Court

19  has yet to adjudicate this precise issue.  The

20  second big question here --

21           THE COURT:  Your brief cites to a New

22  Jersey statute.

23           MR. POLLOCK:  It does.  The New Jersey

24  statute 1:1-2 defines property.  Is that the

THIRD CIRCUIT, 3/13/2014

1   section you're citing to, Judge?

2              THE COURT:  Yes.  The question is

3   whether your case falls within RICO.

4              THE COURT:  Whether the chose in

5   action --

6              THE COURT:  Chose in action, and --

7              MR. POLLOCK:  Right.  But the answer

8   goes deeper than that.  If you look at the

9   chronology of cases, and I think this chronology

10  is important because it's going to be I think a

11  focal point of the discussion that you're going

12  to hear shortly.  I think it's important to look

13  at these in context and a number of them arrive

14  in matrimonial area and therefore the rules are

15  slightly different.  And I'll explain to you why.

16             DiTolvo is the first one in 1974.  And

17  that one says personal injury actions are a chose

18  in action.  And the second one is Kruger, where the

19  New Jersey Supreme Court, they accept DiTolvo.  The

20  third one is Harmon which accepts both of those,

21  appellate division again.

22             Then we get to Amato.  And Amato is a

23  case that says -- and what's interesting about the

24  Amato decision is it says two things because the

THIRD CIRCUIT, 3/13/2014

```
1   court hedges its bets.  The court says at 180 NJ
2   Super 210, that personal injury actions are not a
3   chose in action.  But then the next paragraph it
4   says even if they are, okay, so the court goes on,
5   it goes through -- so it's hedging its bets in that
6   decision.
7               But let's take it at its worst and
8   say that Amato says personal injury actions are
9   not.  So now you have two appellate division cases
10  conflicting.  What's going on in these cases?
11  What's going on in these two cases is in Amato I
12  believe she lost her arm and obviously that was
13  embarrassment, her arm is missing.
14              The question the court is struggling
15  with in DiTolvo and Amato is the loss of income
16  from being unable to perform a job versus the
17  emotional distress of being embarrassed because I
18  can't wear a sun dress because I lost my arm.
19              On those two questions the court is
20  saying one is personal, one is not.  How do we know
21  that?  We look at Landwehr.  Landwehr is the fourth
22  case in a row, 1988.  It specifically rejects
23  Amato's ruling in the very first paragraph because
24  Amato remember under their reading, BASF's reading,
```

1  says you cannot -- these other cases are

2  ridiculous, no.

3            What the New Jersey Supreme Court said

4  is under the equitable distribution statute for

5  matrimonial law if it is a personal injury, I can't

6  wear my sun dress, I've lost my arm, that is

7  personal to the individual, nontransferable.

8            And by the way, in Amato the court

9  looks at one key concept with which the court is

10  well familiar, how do you define property, is it

11  transferable, is it a right you can share.  And so

12  he says well, that's a personal injury, it's not

13  really transferable.  But the Amato court,

14  remember, hedges its bets; if it is property then

15  we've got to look at it differently.

16            Landwehr says two things which are

17  critical.  It then says and if in fact it's loss

18  of income it is distributable and it says it in

19  the very first paragraph.  And the court then, and

20  what's odd here is they cite to the same section I

21  do, at the very end it says and it doesn't matter

22  to us the fact that the action's inchoate, i.e.

23  litigation is --

24            THE COURT:  But you know it seems

THIRD CIRCUIT, 3/13/2014

 1  to me, and there's another case that gets to this,

 2  if we looked at what, not the action itself but

 3  the nature of the injury that gave rise to the

 4  action --

 5            MR. POLLOCK:  Yes.

 6            THE COURT:  -- why isn't your case

 7  more like a personal injury case?  Because the

 8  underlying thing here is the personal injury that

 9  purportedly arose from exposure to asbestos.  It's

10  not like a breach of contract claim or that kind of

11  business or property chosen action.  It's much more

12  like a malpractice claim insofar as it results in a

13  personal injury.

14            MR. POLLOCK:  Well, I think that

15  when you look at who's filing the cause of action,

16  typically it's decedent's estate being prosecuted

17  on behalf of.  And that's where we get to Mittal

18  Barua which is the last case I was going to go to.

19            But I think that when you look at

20  these causes of action, one, they arise in the

21  matrimonial context.  And so the court is grappling

22  with how do we split a limited asset.

23            When you get to your question, Judge,

24  the court is splitting the action and saying if

1  it's a personal pain and suffering perhaps that

2  is unique to the individual.  But what the Supreme

3  Court has done in every one of these cases is also

4  said the married couple are a unit, and to the

5  extent that they have loss of income, that they

6  have expenses, that they have all these other

7  things, and especially where you have in Barua

8  which is the last of the cases, unpublished

9  decision but it is a Chancery Division decision,

10 what the court here doesn't cite to these earlier

11 cases, it's a trust and estates matter, which is

12 a lot like all the cases we're going to have here

13 because the guy, the person died of asbestos

14 exposure.

15              THE COURT:  I thought in the

16 matrimonial case, I may have misunderstood it but

17 a personal injury action is, an award in a personal

18 injury action is designed to make a person whole,

19 one person whole.  So you can't divide such an

20 award.

21              MR. POLLOCK:  Your Honor, I think

22 that's wrong.  I think under Landwehr what the

23 court says --

24              THE COURT:  I knew I was wrong, I just

THIRD CIRCUIT, 3/13/2014

1  wanted to see your take on it.

2            MR. POLLOCK:  I mean I don't know how

3  else to say it.  I think in Landwehr the problem is

4  the court disagrees, and the reason is this.  The

5  court does draw a line, Judge, and I didn't mean to

6  be rude, the court is drawing a line and saying if

7  there's an actual judgment that's a different thing

8  than a future cause of action, and there are a

9  bunch of cases on that point.

10            But where Landwehr is going through

11  that directly addresses your point is that it's

12  drawing a line in the very first paragraph of the

13  opinion.  And it says if it is a personal injury

14  it's embarrassment, it's something unique to you.

15  That may not be transferable to the other spouse;

16  that may belong to you uniquely.  You lost your

17  arm, you got something for that pain and suffering

18  part.

19            But to the extent it's compensatory,

20  it's some other piece, that is absolutely a

21  distributable right under New Jersey law.  And

22  what nails that down is Barua at the end because

23  Barua is a trust and estates case, which is a lot

24  like every one of the cases we're going to have

THIRD CIRCUIT, 3/13/2014

1  here, because the person is dead.

2              THE COURT:  I thought that -- I just

3  wanted, before we lose the time, that the appellees

4  I'm sure are going to refer to this, but I thought

5  your strongest argument was in the New Jersey

6  statute.

7              MR. POLLOCK:  It is.

8              THE COURT:  That that defines personal

9  property to include chosen action, which is what

10  you have.  I think that was your strongest point.

11              MR. POLLOCK:  Well 1:1-2 is absolutely

12  clear, a chose in action is covered.  And this is a

13  chose in action.

14              THE COURT:  But doesn't that go to

15  my question?  What is the nature of the injury that

16  gives rise to the chosen action?  Is it a personal

17  injury?  Or is it the kind of thing you mentioned

18  earlier with the embarrassment arising from --

19  you're trying to look at Landwehr and saying it

20  separates the personal injury which is personal to

21  the individual and not assignable from the personal

22  embarrassment.  I might have that backwards.

23              But why isn't what New Jersey has in

24  mind here just a good old-fashioned loss of income,

THIRD CIRCUIT, 3/13/2014

1  the kind of claim that can be assigned?  And if

2  that's the case why would these kinds of injuries

3  which seem much more like a malpractice injury,

4  driving the chosen action, why would that be the

5  kind of thing that could be assigned?

6          MR. POLLOCK:  Because these are people

7  who died and each one of them had a, they have

8  several, they have their own personal pain and

9  suffering.  They also were sources of income, they

10 were people who lived.  They had an economic value

11 in and of themselves.  That's why I think when you

12 look at New Jersey RICO as a broad remedial statute

13 it goes --

14          THE COURT:  What if it were an

15 automobile accident?  Somebody is driving down the

16 highway, someone sideswipes them, they've got a

17 cause of action against the person who sideswipes

18 them, can that cause of action be assigned under

19 New Jersey law, that personal injury, can it be?

20          MR. POLLOCK:  Once it's a judgment,

21 under Judge Fuentes, the answer is yes.  Prior to

22 that --

23          THE COURT:  That puts the rabbit in

24 the hat though.  The judgment can be assigned.

1  That's easy.

2           MR. POLLOCK:  Right.

3           THE COURT:  But can the injury, the

4  kind of injury we're talking about, can that be

5  assigned?

6           MR. POLLOCK:  Under Mittal Barua,

7  which is the case we just cited from the Chancery

8  Division, the answer is yes.

9           THE COURT:  What if the person goes

10  to the hospital, there's malpractice and there's a

11  claim against the physician for malpractice, can

12  that be assigned?  That's the distinction I think

13  you're trying to make.

14           MR. POLLOCK:  I think the answer is

15  it can, Judge.  But I want to answer the question

16  accurately out of respect for the court.  It's too

17  simple to say yes or no because the question is

18  what are the causes of action.

19           Is the cause of action -- when you

20  file a complaint they file for pain and suffering,

21  which is part of why I started splitting it very

22  carefully here, and then you get to the other parts

23  of the action which are the parts of income, the

24  parts of loss of value, loss of consortium, all

1  those other claims, which are assignable because

2  they belong in part to the other person.

3            So there are clearly parts of

4  the complaint that the court here is not -- it

5  didn't -- what they're citing Amato for is the

6  simple proposition that no cause of action can

7  ever be, arise out of a personal injury action.

8  And the answer is that's simply false.  That's

9  not how the New Jersey courts have looked at it.

10            THE COURT:  One final question,

11  30 seconds or less.  What's Mr. Halket got to

12  do  with this case?  Why are you bringing him

13  into this picture?

14            MR. POLLOCK:  Because each of the

15  individuals that are identified -- and bear with

16  me one second, Judge.  Here it is.

17            THE COURT:  He was a counsel, not

18  general counsel, for a few years in the '80s,

19  right?

20            MR. POLLOCK:  Halket is identified

21  in our complaint at page 32, paragraph 41 of our

22  complaint.  I believe he was one of the people who

23  was maintaining the destruction of ev --

24  maintaining the position, and I'll go back and

THIRD CIRCUIT, 3/13/2014

1  check the record, your Honor.  I thought he was

2  one of the people who took the position that it

3  was okay to have this ongoing conspiracy and

4  misrepresentation.

5          THE COURT:  Okay.  Thank you.

6          MR. POLLOCK:  Thank you, your Honor.

7          THE COURT:  Thank you, Mr. Pollock.

8  Mr. Pollock you dated yourself when you referred

9  to the way-back machine, although I guess they're

10  making a movie of that now.

11          MR. POLLOCK:  I feel like I'm dating

12  myself more and more every day.

13          THE COURT:  Join the club.

14          MR. ASSAF:  May it please the Court --

15          THE COURT:  You're tired already?  You

16  haven't even started yet.

17          MR. ASSAF:  -- Gene Assaf from

18  Kirkland & Ellis on behalf of BASF Catalysts.

19          THE COURT:  Let me ask this and maybe

20  I should ask this of co-counsel.  Sometimes we get

21  down into the weeds of these really intricate legal

22  issues and sometimes just applying the

23  old-fashioned smell test would get us to a better

24  place.

JAMES DeCRESCENZO REPORTING, LLC

1          The allegation here obviously is that
2    fraud was committed which resulted in judgments
3    which would never have been obtained had the fraud
4    not been committed.
5          THE COURT:  Or the settlements would
6    have been more.
7          THE COURT:  Or the settlements would
8    have been settlements as opposed to just kind of
9    nuisance value, get out of my face kinds of
10   documents, confidentiality imposed on that.
11   Spoliation of evidence, and that in the meantime a
12   dangerous product is being put out by your client,
13   I'm not sure exactly the extent to which your
14   client vis-a-vis counsel is alleged to be stirring
15   the pot here.
16          But then we have these things called
17   the Anti-Injunction Act and the definition of
18   property under the New Jersey RICO and maybe
19   conflict of laws issues which all prevent people
20   who died, who allegedly died from asbestos, from
21   having their claims ever heard in a real manner
22   meaningfully heard in court.  The smell test would
23   say there's something very, very wrong with that.
24          Now, the Anti-Injunction Act might say

THIRD CIRCUIT, 3/13/2014

```
 1  no problem there because you can't have a federal
 2  court enjoining a state court or preventing the
 3  defendants from raising defenses.  It may be that
 4  some of these things have been waived, the choice
 5  of law issue may be waived.
 6              But maybe you can help me wrestle
 7  through what is obvious I'm trying to wrestle
 8  through here.
 9              MR. ASSAF:  And I appreciate --
10              THE COURT:  That's a long convoluted
11  question but it lays out what the problem is at
12  least from my perspective.
13              MR. ASSAF:  Yes, your Honor.  And I
14  understand it's a 179 page single spaced complaint.
15  My client bought this business in 2006.  Many of
16  the allegations occurred in 1980.  We bought the
17  issue and we're not running from it.
18              In terms of what -- the question is
19  not whether these plaintiffs can pursue the claims
20  in some forum.  It's whether they can pursue it in
21  the federal district court in New Jersey, which has
22  no connection but for the personal jurisdiction
23  issues raised that BASF is there.  But the five
24  Ohio plaintiffs and the New York plaintiffs have no
```

1  connection with the District Court of New Jersey.

2            And so I do think there are, while

3  there are obviously issues raised by the complaint,

4  the threshold issues of where this case should

5  proceed and how it should proceed, I do think it

6  runs straight into not only the Anti-Injunction Act

7  but the whole basis of the separation of federal

8  and state courts.

9            That Judge Chesler, and let me just

10 defend Judge Chesler a second.  He had a lot in

11 front of him and there was clearly some shifting --

12            THE COURT:  Let's now pile it up on

13 our plates.

14            MR. ASSAF:  There's a lot of shifting

15 going on in terms of the relief sought, and I think

16 you saw some of that this morning as well.

17            THE COURT:  Isn't that plaintiff's

18 choice?

19            MR. ASSAF:  Exactly, your Honor.  I

20 think plaintiffs made a tactical decision.  And if

21 you look at the judicial record here, they repled

22 after Walmart v. Dukes came down, and I understand

23 that.  They said okay, we have a problem with the

24 class here.  So they repled some of the class

THIRD CIRCUIT, 3/13/2014

1  allegations to try to address Walmart v. Dukes.

2  But that doesn't get them there.

3            And let me start off with a Third

4  Circuit opinion that hasn't been discussed but I

5  think is a very important opinion, and that is

6  Judge Joseph F. Weis in U.S. Steel vs. Musisko

7  saying that the Anti-Injunction Act is not some

8  mere anachronism that could be evaded by creative

9  pleading or procedural technicalities.

10           The substance of it is are you trying

11  to call into question the underlying state court.

12           THE COURT:  Well, what he's asking for

13  now, let's focus on the notice and the formation of

14  the trust.  How would that in any way implicate any

15  of the state court judgments?

16           If you go back to the state court and

17  the state court could say to you I'm sorry, but

18  there are judgments here, res judicata applies,

19  you're out of court and grant a motion to dismiss,

20  how would that in way interfere with that or get us

21  into a situation where a federal court is telling a

22  state court you can't proceed?

23           MR. ASSAF:  Couple responses, your

24  Honor.  First of all, the record's pretty clear

1  there are over a hundred asbestos cases against

2  BASF pending today in state and federal courts all

3  over the country.  And there's no motion, as far as

4  I know, where there's an allegation of continuing

5  document destruction.

6              THE COURT:  Are you saying the

7  evidence that's in this warehouse, wherever it is,

8  locker 52, wherever this evidence is stashed, that

9  evidence is available in all of the currently

10  pending, or those cases which could be brought,

11  assuming no statute of limitations issues, that

12  evidence would be available?

13              MR. ASSAF:  Yes, your Honor.  There

14  was no serious allegation in front of Judge Chesler

15  that this is an ongoing issue.  And in fact if it

16  were an ongoing issue those hundred courts across

17  the country, they would be very busy addressing it,

18  and rightfully so.

19              THE COURT:  It sounds like an

20  agreement to me then.

21              MR. ASSAF:  No.

22              THE COURT:  You agree with Mr. Pollock

23  that you will maintain --

24              THE COURT:  No.  The fine print's

THIRD CIRCUIT, 3/13/2014

1   coming.

2            MR. ASSAF:  No, your Honor.  What

3   I'm saying is that what we're litigating is -- are

4   actual, not hypothetical claims about what could be

5   brought and what should be done, there are actual

6   litigation cases going on today on the asbestos

7   dockets in cases, including in New Jersey.

8            And so I'm saying that to the extent

9   there's any issue with a plaintiff who has a

10  pending asbestos claim against BASF and what's

11  happening in terms of the discovery in that case,

12  that's actually being addressed by trial judges

13  now.

14           So I'm saying that's not an exception

15  to the Anti-Injunction Act or to the federalism

16  principle that all of a sudden now Judge Chesler

17  could come in as a pseudo discovery master and say

18  I have some issues here and I'm going to corral

19  them all in and act, in both in terms of spoliation

20  and I guess a notice program, and address those.

21  So let me address the notice program as well.

22           Again, both notice and spoliation, I

23  don't think those were assigned as appellate errors

24  coming up in terms of this is what we really want,

THIRD CIRCUIT, 3/13/2014

1  we really want a notice program and an injunction

2  as to spoliation.  That's a shifting ground and I

3  think it's a shifting ground in face of Atlantic

4  and the clear -- and Musisko from the Third Circuit

5  that you can't call into question completed state

6  court actions.

7            So now this is a new theory that

8  wasn't addressed in front of Judge Chesler, nor

9  do I think it would have passed muster in front of

10 Judge Chesler.  To the extent there's notice there

11 would have to be a class and it would have to be

12 certified.  And as this court well knows there are

13 obviously a wide range of requirements under Rule

14 23, but there's not a free flowing notice cause of

15 action for a court sitting in equity.

16            THE COURT:  Well Atlantic is a 1970

17 case.  You're saying that they just stumbled on

18 it and they're changing their position to take

19 advantage of that?

20            MR. ASSAF:  I do.  Well, your Honor,

21 I think so because if you look at the first

22 complaint, the first complaint was very clear that

23 they said we would like to undo state court

24 judgments.  Then we started to brief Atlantic --

THIRD CIRCUIT, 3/13/2014

1          THE COURT:  Now it's been amended.

2          MR. ASSAF:  And now it's been amended.

3   But now they still say in paragraph 16, paragraphs

4   322, prayer B for relief, that they want to direct

5   the parties, BASF, from taking advantage of res

6   judicata or statute of limitations issues.  And

7   again that comes back to United States --

8          THE COURT:  Let's forget -- that

9   seems to me to be right in the middle of the

10  Anti-Injunction Act.  But focus on the other

11  part which may not even be there any more, unless

12  I misinterpreted what Mr. Pollock is now pressing,

13  the part where he's asking for a declaration of

14  fraud.

15          How does that get under the

16  Anti-Injunction Act?  Let's assume we look at this

17  or send it back and ask the district court to look

18  at it and say determine whether or not there's

19  fraud.  And let's assume for a second there's no

20  problem with the advisory opinion there, and there

21  may be, I don't know.

22          MR. ASSAF:  Okay.  So yes.  So I have

23  two issues.  I wanted to address Judge Fuentes'

24  and Judge Ambro's questions about the analytical

THIRD CIRCUIT, 3/13/2014

1  framework.  I think you asked about fraudulent

2  concealment versus fraud and words versus conduct.

3                 And so if I may, Chief Judge McKee, I

4  would like to just address that framework quickly

5  and then talk about why the fraud claim can't be

6  sustained.

7                 THE COURT:  That is the nicest way

8  anyone has ever told me shut up, I'm going to

9  answer their questions first.  That was very well

10 done, Mr. Assaf, very smooth.

11                MR. ASSAF:  You know, what your

12 Honor --

13                THE COURT:  Make sure we get a

14 transcript.

15                MR. ASSAF:  So, what I learned in

16 Scranton, I'm now going to answer your question

17 right off bat.

18                THE COURT:  Okay.

19                MR. ASSAF:  And it's the advisory

20 opinion issue in terms of fraud.  They still have

21 to prove a substantive claim for a plaintiff.  So

22 a plaintiff here has to prove a substantive claim.

23 And I think they're putting the cart before the

24 horse, saying well all we really want is some class

THIRD CIRCUIT, 3/13/2014

1  type relief on behalf of an individual.  And that's
2  not what is permitted.
3           They have to prove up their
4  substantive claim in order to then seek relief.
5  There's no free flowing relief in terms of I'm a
6  plaintiff and I want to prove some element.  And I
7  want to go to Ashmus vs. Calderon, the habeas case
8  from the Supreme Court.  And I think that's very
9  analogous here.  What they're trying to do is have
10 a court find some issues but not all issues.
11          THE COURT:  Why isn't that a Catch-22?
12 Because if they proceed that way, and I agree that
13 gets around the Article III case for controversy
14 advisory opinion issue, but they're going to run
15 smack-dab into res judicata if they do that.
16 They're going to go in and they're going to find
17 out, well, we've got these other cases and why
18 aren't you bound by that?  Why isn't that res
19 judicata?
20          Unless they can allege that those
21 prior judgments were obtained by fraud, what good
22 is it going to do?  If they don't put the cart
23 before the horse they're not going to have a cart
24 or a horse, it seems to me, because they're going

THIRD CIRCUIT, 3/13/2014

1  to be out of court.

2                  MR. ASSAF:  I agree they're going to

3  have problems with their case and maybe I'm missing

4  your Honor, but I don't think they could prove up a

5  part of their claim and then use that ruling to go

6  and reopen state court cases.  I think that --

7                  THE COURT:  Are you talking about

8  spoliation claim or fraud claim or --

9                  MR. ASSAF:  I think in terms of the

10 injunctive and declaratory relief sought they

11 cannot take injunctive or declaratory relief and

12 go to state court and undo it.

13                 THE COURT:  And you're saying they

14 can't because of the Anti-Injunction Act?

15                 MR. ASSAF:  Because of the

16 Anti-Injunction Act.

17                 THE COURT:  Why can't the state

18 court -- if they go to the state court and let

19 the state court decide that then there's no problem

20 under the Anti-Injunction Act.  The state court can

21 say I'm sorry, we're not going to do it.  Or the

22 state court can say given this, the judgment

23 presented before is not valid, it's void or void

24 ab initio and we're going to enter the claim.  But

THIRD CIRCUIT, 3/13/2014

1    it's not a federal court in that situation

2    interfering with a state court, is it?

3                    MR. ASSAF:  I think that still gets to

4    the Anti-Injunction Act, right?  That's the whole

5    problem of having a federal court decide some

6    issues and then taking that paper to the state

7    court.

8                    THE COURT:  Which the state court can

9    do whatever it wants.

10                    MR. ASSAF:  Well, except in a state

11    court in Ohio they're going to say I have a

12    federal court order that has X,Y and Z.  And the

13    Anti-Injunction Act jurisprudence, I think the two

14    key points are a unanimous Supreme Court in Smith

15    v.  Bayer saying any doubt as to resolving the

16    application act has to be resolved in favor of the

17    act.

18                    And two, again come back to Musisko

19    and Hill saying it's not -- you can't mistake title

20    for effect.  Judge Weis's phrase, turned a great

21    phrase, don't mistake title for effect.

22                    And the fact that the effect of this

23    order is to call into question, it's not just

24    rendered a nullity, it's to call into question the

1  effectiveness of the prior state proceeding.  And

2  that's why I think, your Honor, it still runs into

3  the Anti-Injunction Act.

4          So where you and I started, the

5  question that you posed, this all gets to where

6  is the proper forum.  Where is this?  Why are we

7  doing -- why are we asking Judge Chesler to

8  litigate cases when they were litigated in Ohio and

9  New York and those courts can decide what they want

10  as to whether causes of action exist, to your

11  question, or whether there's a 60(b) issue under

12  their local jurisprudence.

13          THE COURT:  The case is not improperly

14  in New Jersey, is it?

15          MR. ASSAF:  Pardon me?

16          THE COURT:  The case is not improperly

17  in New Jersey.

18          MR. ASSAF:  Well, no, I don't think it

19  was filed -- there's no personal jurisdiction

20  problem.  I think though there's an Anti-Injunction

21  Act problem of what's the, what is the connection

22  of this court to the underlying litigation.

23          And again, your Honor, to kind of

24  illustrate this, Judge, and I -- it's Judge Weiner,

THIRD CIRCUIT, 3/13/2014

1   the Eastern District of Philadelphia judge, he had

2   a whole host of these talc asbestos cases here in

3   Philadelphia.  So it's again this question of why

4   is Judge Chesler being asked to litigate these

5   cases from Ohio and from New York?  And it's

6   putting him in a position.

7               And to your question, Chief Judge

8   McKee, about kind of what's happening here in the

9   relief and how come the pleadings have spun out as

10  they have, it all has to do with Walmart, Comcast,

11  all the class actions, they have serious class

12  problems and so they're trying to plead around

13  that.  But that's not a license to kind of get

14  around the Anti-Injunction Act.

15              THE COURT:  But there's no Rule 23

16  issues before us today, right?

17              MR. ASSAF:  Well, there are no 23

18  issues technically in front of you but to the

19  extent the court is kind of looking at the

20  pleadings and where we are --

21              THE COURT:  Help me understand that.

22  How is Rule 23 before us, except --

23              MR. ASSAF:  No, it's not.

24              THE COURT:  Okay.

THIRD CIRCUIT, 3/13/2014

1    MR. ASSAF:  The thing that's before

2  you, I do think it's part of the judicial record,

3  is below there is a motion to strike the class

4  allegations.  And this is on page 48 of our brief.

5  And it was very telling because what the plaintiffs

6  then said is we are not going to have mini-trials,

7  we are not going to prove up the elements of the

8  underlying asbestos cases.

9    And so I think that is -- so Rule 23

10  is not in front of you but certainly there are

11  admissions as to what they're actually seeking,

12  that they're not seeking to prove up their claims.

13  It then kind of leads into a question you raised

14  and that is the fraudulent concealment claim and

15  how is that pled.

16    So first let me say in terms of Judges

17  Ambro and Fuentes, the analytical framework I've

18  looked at is words are covered by the litigation

19  privilege.

20    THE COURT:  Words are?

21    MR. ASSAF:  Words are.

22    THE COURT:  Words are.  It's

23  communication, okay.

24    MR. ASSAF:  Communications.

THIRD CIRCUIT, 3/13/2014

```
1              THE COURT:  Right.
2              MR. ASSAF:  And again Ruberton --
3              THE COURT:  In a judicial proceeding.
4              MR. ASSAF:  -- Loigman, and they use
5    both privilege and immunity, and I think that's a
6    telltale sign.  And they also say the scope is
7    extraordinary.
8              Conduct I think is an exception, and
9    this is made clear in our briefs, is an exception
10   to the litigation privilege, and thus fraudulent
11   concealment, the spoliation, the conduct is an
12   exception to the litigation privilege.
13             THE COURT:  Right.
14             MR. ASSAF:  And so now the next step
15   in the framework is have they pled up a fraudulent
16   concealment claim by conduct.  And I actually don't
17   think that they have --
18             THE COURT:  Well, the conduct would
19   be the actual taking after you settled Westfall,
20   taking the, and having a confidentiality agreement
21   entered into, taking the evidence and putting,
22   sequestering it away.  That would seem to be --
23   that has to be conduct, that can't be words.
24             MR. ASSAF:  I agree with you.
```

THIRD CIRCUIT, 3/13/2014

```
 1            THE COURT:  You're saying they didn't
 2  plead it, and that's what Judge Chesler said.
 3            MR. ASSAF:  Well, I think they pled
 4  some of it, your Honor.  I don't think it's
 5  sufficiently pled.  And so I agree with you on
 6  conduct.  But here's why I say it's not sufficient.
 7  The New Jersey litigation privilege, I think
 8  they're saying we're not going to have litigation
 9  about litigation --
10            THE COURT:  Litigation privilege does
11  not apply to the --
12            THE COURT:  Hang on for a second.
13  Remember, all they have to do is -- I mean you've
14  got Iqbal and Twombly.
15            MR. ASSAF:  Right.
16            THE COURT:  You've got it.  But it
17  doesn't mean that they haven't said something
18  plausible with regard to this, and if need be they
19  may ask for a chance to amend again.  But it seems
20  to me that you've got, on the fraudulent
21  concealment part, you've got a, you've got probably
22  the weakest part of your argument.
23            MR. ASSAF:  So let me address that.
24  As I was saying, I think that fraudulent
```

THIRD CIRCUIT, 3/13/2014

1  concealment is obviously exempted from the

2  litigation privilege.  And so I think the New

3  Jersey courts have said we're going to have an

4  exception with litigation about litigation, it's

5  a higher standard.  And so when you marry that with

6  Iqbal, Twombly, it's not just the recitation of the

7  elements, that there were cases, bad things

8  happened in the cases, my case I would have gotten

9  more in my case.

10            I actually don't think that's enough,

11  especially on the allegations here where --

12            THE COURT:  Why isn't it enough to

13  say that you destroyed evidence, you concealed

14  evidence, and if I had had that evidence I would

15  have settled my case for more.

16            THE COURT:  A higher amount.

17            THE COURT:  For more, or I may not

18  have settled at all, I might have wanted to go to

19  trial.

20            MR. ASSAF:  For three reasons, your

21  Honor.  One is that it has to be more than that.

22  And we know that from Swick vs. New York Times, the

23  New Jersey court on fraudulent concealment, where

24  The New York Times, The New York Times actually

THIRD CIRCUIT, 3/13/2014

1    destroyed the printing press at issue, no doubt

2    about it, undisputed.

3              And the New Jersey court said but

4    that's not enough in this case because one of the

5    defendants, one of the defendants had an unusual

6    procedural posture and they were dismissed, and the

7    court said, which I think goes to the standard in

8    New Jersey, if you're going to have litigation

9    about litigation you have to at least make some

10   showing of a case within a case.  And so --

11             THE COURT:  A showing?  Because we're

12   still at the pleading stage here.

13             MR. ASSAF:  Well, I think it has to

14   be, but it has to be more than thread-bare

15   pleading.  So let me take the malpractice example

16   because I think this is very analogous in terms of

17   litigation about litigation.

18             If somebody misses a statute of

19   limitations, we're going to sue you in New Jersey,

20   statute of limitations was missed, I was harmed.

21   And what courts, including New Jersey, have said

22   no, no, no, you have to prove more, that you would

23   have prevailed in that case but for the statute of

24   limitations.

THIRD CIRCUIT, 3/13/2014

1            And I think here when you have cases

2  with anywhere, the five plaintiffs anywhere from 39

3  to 221 different defendants, they haven't pled what

4  happened to those defendants, whether these

5  plaintiffs admitted later on that they had

6  dismissed their case because of a variety of

7  reasons, there has to be something more than mere

8  thread-bare allegations.  And in terms --

9            THE COURT:  This is really different

10 from that situation because of the nature of the

11 harm they're alleging.  They're alleging that there

12 was asbestos in your client's product, that they

13 brought these suits, that they were injured as a

14 result of the asbestos in the product, and maybe

15 this is where you're going.

16            It seems to me a natural inference

17 that they're saying that had we known, but for your

18 client's act of fraud and spoliation that we would

19 have either gone to trial or settled for a more

20 realistic amount rather than having these

21 settlement, these nuisance settlements.

22            And you're I guess saying what Judge

23 Chesler said, that there's no causal link there,

24 but it seems to me the causal link is endemic in

1 the pleading.  You think Twombly requires that kind

2 of precision in this kind of a case?

3         MR. ASSAF:  I think two things, your

4 Honor.  I think Twombly does require more in this

5 type of case, especially where there are multiple

6 defendants and issues of alternative causation and

7 whether the plaintiffs -- because otherwise the

8 plaintiffs would always say, every plaintiff, every

9 party, even defendants always say my settlement

10 could have been better if I did X.  We all as

11 litigators think that a year later, right?

12         THE COURT:  But clearly if you have

13 evidence they did something wrong the settlement

14 could have been higher.

15         MR. ASSAF:  But that's where I come

16 back to Swick and why I think New Jersey law --

17         THE COURT:  Basically if they could do

18 a comparison, for example in Westfall when it was

19 found, or Paduano, when they settled, both, where

20 they settled for a higher amount, I don't know.

21 But they might be able to develop that.  There's

22 that possibility.  They have to show some kind of

23 damage and that's the way they would try to show

24 it.

1          MR. ASSAF:  But I think it has to

2    be more, your Honor.  When you have a case -- the

3    judicial record here is clear.  There are anywhere

4    from 39 to 221 defendants for each plaintiff.  So

5    it's not just well, gee, you look at prior asbestos

6    settlements in terms of the defendant.

7          You look at what this plaintiff

8    actually alleges in terms of their causation.

9    Let's say they worked in a brakes factory and

10   their only allegation is that they once used a

11   talc product on one day.

12          I think that would -- you would

13   have to actually say my client worked in a brake

14   factory, they settled with Bendix for X millions

15   of dollars, they dismissed the other 220 defendants

16   because there was no other causation.  Because

17   that's within their power to plead.

18          And then in terms of what's in front

19   of this court, your Honor, they have not appealed,

20   they have not appealed the leave to amend, that

21   they were not properly given leave to amend.  And

22   I think they've waived that.

23          And in fact I think they've come to

24   this court already, at least until this morning,

THIRD CIRCUIT, 3/13/2014

1  in their pleadings saying we like our complaint.

2  There are no other facts we would have adduced in

3  order to meet Iqbal, Twombly.

4            So I think they've waived the

5  appellate issue in front of the court in terms of

6  their seeking leave to amend.

7            THE COURT:  But they have said that

8  they would have settled, settlements would have

9  been for more.  And if that's the case, because of

10  the fraudulent concealment, that is the equivalent

11  of damage.  It is damage.

12            MR. ASSAF:  I still -- so I come back

13  to this.

14            THE COURT:  The elements of fraudulent

15  concealment are that there's a legal obligation, it

16  was material and it was not reason -- the plaintiff

17  could not have reasonably obtained access to the

18  evidence otherwise, defendant intentionally

19  withheld, altered or destroyed the evidence, and

20  that the plaintiff was damaged in the underlying

21  litigation by having to rely on a record that did

22  not contain the concealed evidence.

23            MR. ASSAF:  Yes, your Honor, from

24  Loigman those are the -- I'm sorry, from

```
 1   Rosenblit --

 2              THE COURT:  Rosenblit, yes.

 3              MR. ASSAF:  -- they're the elements,

 4   and then Rosenblit goes on to say that the

 5   fundamentals of the underlying litigation will also

 6   require exposition.  And that's what I'm saying.

 7   In these type cases with multiple defendants you

 8   require exposition.

 9              And this isn't just my advocacy that

10   they don't want to do it.  This is where I come

11   back to what they told Judge Chesler.  They said,

12   and this is in the record at 3546 in their

13   opposition to strike the class cert motions, this

14   is one of the critical phrases:  Because the claims

15   here are for lost causes of action the plaintiffs

16   have no obligation to prove elements of their

17   underlying personal injury, including claims for

18   product liability in this case.

19              THE COURT:  Would I be correct that a

20   litigant who was deprived of the use of evidence

21   and settled the case could never ever succeed in

22   having that case relitigated?

23              MR. ASSAF:  No, I don't think never.

24   I could actually foresee situations where a
```

THIRD CIRCUIT, 3/13/2014

1  plaintiff would say I sued these defendants, here's
2  my settlement with these defendants, here's what
3  these defendants did, here's my injury and my
4  exposure to now the offending party.
5           And so I think that illustrates that
6  it's more than just --
7           THE COURT:  Well, what if you say
8  I settled and if I had known that this evidence
9  existed I would not have settled for the amount
10 that I settled?
11          MR. ASSAF:  Respectfully, your Honor,
12 I don't think that's enough because I think that
13 would swallow up the exception.  Every plaintiff
14 would say that.
15          THE COURT:  So you're saying even
16 though the Supreme Court in Iqbal and Twombly
17 said they weren't scuttling the concept of notice
18 pleading, although the commentators say that they
19 were scuttling notice pleading, the court said it
20 wasn't scuttling notice pleading, you're saying in
21 effect that we have more, more of a burden now than
22 notice pleading, that Iqbal and Twombly results in
23 more than notice pleading because the ABCD posture
24 that you laid out before seems to me to get you

1   there in terms of causation if the test is notice

2   pleading.

3           It doesn't get you there if the

4   pleading requirement is more heightened than notice

5   pleading.

6           MR. ASSAF:  So, your Honor, I don't

7   know if this court has to resolve that issue.  But

8   with these substantive claims, because the only

9   substantive claim that I think is left after

10  litigation privilege is fraudulent concealment.

11  And I think that's a higher standard in terms of

12  some exposition to pick up Rosenblit.  That there's

13  something that has to be pled that's more than --

14          THE COURT:  Because of the fraud hook.

15          MR. ASSAF:  Yes.  And also a case

16  within a case.  That something -- you have to

17  provide an exposition of something more than

18  just following the elements.  And that's what I'm

19  getting to.  If you look at their complaint, yes,

20  any lawyer could just follow the elements, but I

21  think here you have to have some exposition with so

22  many defendants, so many causation issues that this

23  court has dealt with over the years, there has to

24  be something more than just saying I would have

1  settled for more because that would swallow the

2  exception.  You would always say that.

3              THE COURT:  Can I ask you about the

4  litigation privilege?

5              MR. ASSAF:  Yes, your Honor.

6              THE COURT:  Because I asked

7  Mr. Pollock also.  I have found no case anywhere

8  that would allow for the invocation of the

9  litigation privilege where a lawyer deceives or

10 misleads or lies in the course of litigation.

11             MR. ASSAF:  So I've looked in New

12 Jersey, your Honor, and I think Ruberton is cited

13 in our briefs.

14             THE COURT:  But that case does not

15 deal with fraud, does it?

16             MR. ASSAF:  Well, it's false

17 statements; are false statements covered by

18 litigation privilege.

19             THE COURT:  Well, it's abuse of

20 process.

21             MR. ASSAF:  Right.  But whether there

22 are false or fraudulent statements, that court said

23 a statement made in the course of a judicial

24 proceeding is absolutely privileged and wholly

THIRD CIRCUIT, 3/13/2014

1  immune from liability.  We cite in our briefs Giles

2  from the District of New Jersey --

3             THE COURT:  I just want to ask you one

4  thing.

5             MR. ASSAF:  Sure.

6             THE COURT:  I mean if we adopt your

7  view, would it be the rule that any time a lawyer

8  deceives or misleads or lies or makes any

9  misrepresentation in the course of litigation or in

10 the course of judicial proceedings, is it your rule

11 that those statements would be, would qualify for

12 the immunity?

13            MR. ASSAF:  Your Honor, under New

14 Jersey, and I think there are different states, but

15 yes, under New Jersey even the New Jersey Supreme

16 Court has said it is extraordinary in scope, and

17 then they go on to say since it's -- the privilege

18 or immunity is extraordinary in scope, the remedies

19 for you are to seek sanctions, initiate

20 disciplinary proceedings, there may be criminal

21 proceedings, but it's not, we're not going to have

22 litigation over words in litigation.

23            So yes, your Honor, I know it may be

24 appealing from a -- unappealing from a professional

1   responsibility standpoint to think how could this

2   be the rule.

3              THE COURT:  From the smell test

4   standpoint also.

5              MR. ASSAF:  Pardon me?

6              THE COURT:  From the smell test

7   standpoint also.

8              MR. ASSAF:  Right.  How could we

9   have this test.  But I think New Jersey has made a

10  policy decision that -- and even the Loigman case,

11  they tell Loigman, you know, some day you're going

12  to want to take advantage of this litigation

13  privilege.  And so Giles, the District Court of New

14  Jersey --

15             THE COURT:  You mention professional

16  responsibility.

17             MR. ASSAF:  Yes.

18             THE COURT:  And indeed professional

19  responsibility says that a lawyer shall not make --

20  shall not knowingly make a misleading statement or

21  statement known to be false in any judicial

22  proceeding.

23             MR. ASSAF:  Agreed.

24             THE COURT:  You don't disagree with

1  that.

2           MR. ASSAF:  I totally embrace that,

3  your Honor.

4           THE COURT:  But in litigation you say

5  that doesn't matter, that doesn't count.

6           MR. ASSAF:  Gene Assaf as a practicing

7  lawyer of the bar, no, I've never been accused

8  of it and I hopefully never will, your Honor.  But

9  in terms of my reading of the New Jersey Supreme

10 Court and the law there, they've made a policy

11 decision --

12          THE COURT:  Which actually brings us

13 full circle.

14          THE COURT:  Yes, it does.

15          THE COURT:  As to which law actually

16 does apply and under a choice of law analysis, but

17 before you even get there has it been waived and

18 what is this circuit's law on whether it can be

19 waived.

20          THE COURT:  And Mr. Assaf, I'm not

21 sure it's a question, it's a statement that we are

22 back where we started from.  But we let you go,

23 obviously --

24          MR. ASSAF:  Sure.

THIRD CIRCUIT, 3/13/2014

```
 1              THE COURT:  -- quite a bit, as we
 2   let Mr. Pollock go.  We still have two of your
 3   colleagues to hear from.  So let me move on and
 4   hear from Mr. Shanmugam.
 5              MR. ASSAF:  Would you like me to
 6   address waiver or the choice of law?
 7              THE COURT:  Can you do it in a couple
 8   minutes?
 9              MR. ASSAF:  I think I could, your
10   Honor.
11              THE COURT:  Asking a lawyer that,
12   that's a stupid question.
13              MR. ASSAF:  Let me say I'll do it very
14   quickly.
15              THE COURT:  That wasn't the question.
16              MR. ASSAF:  Oh.
17              THE COURT:  Because your very quickly
18   may not be my very quickly.  So let's hold it to
19   two minutes.
20              MR. ASSAF:  Okay.  Two minutes, yes,
21   your Honor.  I adopt Judge Ambro's recitation of
22   Third Circuit law on this and I acknowledge that
23   it's somewhat unclear.  But I think at the end of
24   the day they pled it under New Jersey common law,
```

THIRD CIRCUIT, 3/13/2014

1  they didn't object to it being briefed under New

2  Jersey common law, getting back to your question

3  about Rule 23, because I think they realize they

4  had a huge Klaxon problem in terms of applying 50

5  states to these issues.  So they said okay, we're

6  going to brief it under this issue.  So they did it

7  underneath.

8           And so Judge Chesler had that, nobody

9  objected, and I don't even think they've objected

10 on appeal as an assignment of error.

11          And finally, your Honor, then even

12 if the court were to find that it's not waivable

13 and they've somehow preserved it, the worst-case

14 scenario is that you would remand to Judge Chesler

15 for him to conduct a choice of law analysis which

16 may require an evidentiary hearing in terms of

17 trying to decide which law applies.

18          THE COURT:  Thank you.

19          MR. ASSAF:  Under two minutes.

20          THE COURT:  That was under two

21 minutes.

22          MR. ASSAF:  Thank you, your Honor.

23          THE COURT:  That was 55 seconds.  Very

24 good.

THIRD CIRCUIT, 3/13/2014

```
 1              MR. ASSAF:  It's amazing you put all
 2   these notes together, you never use them.
 3              THE COURT:  I do the same thing with
 4   all the stuff that's on this computer.
 5              THE COURT:  Been there, done that.
 6              MR. SHANMUGAM:  Good morning, your
 7   Honors, Kannon Shanmugam of Williams & Connolly.
 8              THE COURT:  Slow it down, Kannon.
 9   What's your last name?
10              MR. SHANMUGAM:  Kannon Shanmugam.
11              THE COURT:  Shanmugam.
12              MR. SHANMUGAM:  Yes.  Thank you.
13              THE COURT:  Okay.  I mispronounced it
14   again.  I apologize for that.
15              MR. SHANMUGAM:  No.  That's all right.
16              THE COURT:  My guess is that our
17   dialogue with Mr. Assaf has already gotten into a
18   lot of the issues that you wanted to cover.
19              MR. SHANMUGAM:  It has, your Honor.
20   So with the court's leave I think what I would --
21              THE COURT:  The one thing is that, as
22   he said, we bought this problem.  They took over I
23   guess Engelhard, we bought the farm.  In your case
24   your client is part of the farm.
```

THIRD CIRCUIT, 3/13/2014

```
 1              MR. SHANMUGAM:  Yes, that is certainly
 2   correct.  And so I think what I'd propose to do
 3   today, with the court's leave, is very briefly to
 4   address the Anti-Injunction Act and Article III
 5   issues, because I think we would acknowledge that
 6   those issues are not dispositive of the entirety
 7   of the case.  They dispose of only a portion of
 8   the case, the portion relating to injunctive and
 9   declaratory relief.
10              THE COURT:  If it were to go back are
11   you saying today that when it goes back for the
12   other cases, when you say it's not dispositive of
13   the entire case, I assume you're talking about all
14   those other asbestos cases sitting out there?
15              MR. SHANMUGAM:  Well, I'm talking
16   about this case, the case that the court has before
17   it, because the plaintiffs have sought some other
18   types of relief, and so the court would need to
19   address the validity of plaintiffs' claims under
20   state law.  And so I think what the courts --
21              THE COURT:  Which state?
22              THE COURT:  New Jersey.
23              MR. SHANMUGAM:  Well, New Jersey law
24   because that is --
```

THIRD CIRCUIT, 3/13/2014

```
 1        THE COURT:  But which law would New
 2  Jersey look to?
 3        MR. SHANMUGAM:  Well, why don't I
 4  turn to that issue, and I do want to say just a
 5  couple of words about the Anti-Injunction Act
 6  because there are a couple of issues specific to my
 7  client, my clients that have been addressed today.
 8        But on this question of choice of law
 9  it is certainly true, as Mr. Assaf said, that this
10  case has been litigated on the assumption that New
11  Jersey law applies.  And I do think that the better
12  view is that choice of law can be waived, which is
13  to say that if the parties litigate the case --
14        THE COURT:  You certainly have the
15  circuits lined up with you.  Fifth, Sixth and
16  Seventh go your way, possibly the Second, I'm
17  not so sure about that.
18        MR. SHANMUGAM:  Yes, and there is some
19  authority from this court, as you acknowledged and
20  I would cite the Publicker --
21        THE COURT:  Well, we are all over the
22  place.  This court is all over the place.
23        MR. SHANMUGAM:  That is true, but --
24        THE COURT:  And my colleague to my
```

1  right was part of that.

2          MR. SHANMUGAM:  But there is

3  substantial recent authority for the proposition

4  that when parties do not raise conflicts of law the

5  court can apply the law of the forum state.  Now of

6  course choice of law is ultimately --

7          THE COURT:  I think the argument

8  ultimately you would have to make is that Neely, by

9  being en banc, impliedly overruled the 1944 case

10  and the 1958 case in Parkway Bakery.

11          MR. SHANMUGAM:  Yes.  And I would just

12  say this.  The one thing that I would cite to this

13  court is the second restatement on conflicts,

14  Section 136 Comment H, which I think stands for the

15  proposition that when no party has raised choice of

16  law a court may apply the law of the forum state.

17          And after all you look to New Jersey

18  law when deciding this question of conflicts of

19  laws because New Jersey is the forum state, and as

20  Judge Ambro pointed out, New Jersey is a second

21  restatement state.  But I do think it's important

22  to kind of understand the backdrop of this case

23  which I think underscores why it makes sense to

24  apply New Jersey law here.

THIRD CIRCUIT, 3/13/2014

```
 1              The plaintiffs brought these state
 2   law claims and they proceeded under New Jersey law.
 3   And obviously when we moved to dismiss we asserted
 4   the litigation privilege under New Jersey law.
 5              At that point the plaintiffs made no
 6   effort to rely on the law of other jurisdictions.
 7   I suspect in part precisely because plaintiffs
 8   wanted to maintain their ability to proceed on a
 9   classwide basis, and so Judge Chesler decided this
10   issue as a matter of New Jersey law.
11              Now I think critically before
12   this court the plaintiffs also stopped short of
13   asserting that Ohio law or the law of any other
14   jurisdiction applies.  The plaintiffs in footnote
15   seven of their brief at page 23 simply say, and
16   I'm quoting, had the district court conducted a
17   choice of law analysis and determined Ohio law to
18   apply there is no question that defendants would
19   not be permitted to avail themselves of Ohio's
20   litigation --
21              THE COURT:  And your only argument is
22   that they waived it --
23              MR. SHANMUGAM:  Well, that is correct.
24              THE COURT:  -- in your footnote 12.
```

```
 1            MR. SHANMUGAM:  Both before the
 2   district court and before this court.  And we
 3   certainly think that choice of law can be waived
 4   and that that is the better view as reflected in
 5   that provision of the second restatement which I
 6   cited.
 7            I would note parenthetically that we
 8   dispute the proposition that under Ohio law it is
 9   clear that the litigation privilege --
10            THE COURT:  You've got conflicting --
11            MR. SHANMUGAM:  -- would not apply to
12   fraud claims, but --
13            THE COURT:  -- law.  You got the
14   Ellis case which would support you which is a state
15   law, not a Supreme Court case, then you've got the
16   Northern District of Ohio case in Kramer which
17   seems to go the other way but it's a district
18   court.
19            MR. SHANMUGAM:  Yes, but I think  that
20   the more critical point is that the plaintiffs here
21   really are litigating this on the assumption that
22   New Jersey law applies and at least above the line
23   in their brief they simply take issue with our
24   characterization of New Jersey's expansive
```

1  litigation privilege.

2            And since we're on the subject why

3  don't I just go to that point very briefly, Judge

4  Fuentes, and address some of your questions with

5  regard to New Jersey's litigation privilege.

6            I think, with respect, that it is

7  quite clear that under New Jersey law the

8  litigation privilege applies beyond its sort of

9  traditional common law core --

10            THE COURT:  It applies to

11  communications, does it not?  It can't apply to

12  conduct.

13            MR. SHANMUGAM:  Well, that is correct,

14  and that is why we are invoking the litigation

15  privilege as preclusive of the entirety only of

16  the fraud claim.  And as Judge Chesler noted in a

17  footnote in his opinion, the litigation privilege

18  may apply to the other state law claims as well to

19  the extent that they are based on statements rather

20  than conduct.

21            But it is certainly true that under

22  New Jersey law and in particular under the

23  appellate division's decision in Viviano that there

24  is this distinction; the litigation privilege does

THIRD CIRCUIT, 3/13/2014

1  not apply to conduct.  And so if plaintiffs brought

2  a purely conduct-based claim under state law the

3  litigation privilege would not apply.

4            THE COURT:  I assume you'll agree

5  with your colleague's argument about the spoliation

6  claim because then that gets, if you're right that

7  gets you to the conduct.

8            MR. SHANMUGAM:  Well, I think the

9  fraudulent concealment claim interestingly in this

10  case is based at least in part on statements

11  because if you read that claim it relies on --

12            THE COURT:  I understand why you're

13  doing it and that's a wonderful strategy for

14  argument, but let's forget about trying to put a

15  tether between the statement and the conduct.  Just

16  focus on the statements -- just focus on the

17  conduct for a second and look at that.

18            If they survive the pleading challenge

19  and if Judge Chesler was wrong in saying that they

20  didn't sufficiently plead the fraudulent

21  concealment, you're conceding, I think, that the

22  litigation privilege would not bar that claim, that

23  claim would still go forward.

24            MR. SHANMUGAM:  Well, there would be

THIRD CIRCUIT, 3/13/2014

1  an open issue I suppose for Judge Chesler to

2  resolve on remand as to whether this claim, because

3  it is based at least in part on statements, is

4  precluded --

5         THE COURT:  You put the rabbit back in

6  the hat again.

7         MR. SHANMUGAM:  Well, I'm only putting

8  the rabbit back in the hat because this was an

9  issue that Judge Chesler, by his own recognition,

10  did not resolve, namely the extent to which the

11  litigation privilege would bar the state law claims

12  other than the fraud claims.  And he didn't resolve

13  it precisely --

14         THE COURT:  That would be a matter of

15  law for us to decide, wouldn't it?

16         MR. SHANMUGAM:  Well, I think it would

17  be better, frankly, for that to be decided in the

18  first instance by the district court simply because

19  it really turns on --

20         THE COURT:  Is that because you don't

21  like the way our questions are going?  Why?

22         MR. SHANMUGAM:  Simply because it

23  involves an assessment of the nature of the

24  underlying claims.  And again --

THIRD CIRCUIT, 3/13/2014

```
 1              THE COURT:  But it is a purely legal
 2   question.
 3              MR. SHANMUGAM:  Well, it's application
 4   of law to the allegations in this case and it would
 5   require a determination as to the extent to which
 6   those allegations rely on statements.  So this
 7   court certainly could --
 8              THE COURT:  I'm not going to get a yes
 9   or no answer from you, am I?
10              THE COURT:  Time out.  Time out.
11   The claim with respect to Hemstock is that he did
12   an act of sequestering and putting away evidence
13   that was inculpatory.  There's no communication
14   whatsoever.  That's conduct.
15              MR. SHANMUGAM:  Right, and I'm not --
16   look, let me step back and just say that I'm not
17   disputing the proposition that you could plead a
18   fraudulent concealment claim in the abstract that
19   was based purely on the conduct.
20              My submission is simply that when
21   you look at the fraudulent concealment claim that
22   is pleaded here it turns almost centrally on
23   statements that were made to the extent that,
24   alleged statements that were made to the extent
```

1  that there is no evidence that the products contain

2  asbestos.  And obviously --

3           THE COURT:  Would that be part of

4  the fraud claim as opposed to the fraudulent

5  concealment?

6           MR. SHANMUGAM:  It's actually part

7  of the fraudulent concealment claim, somewhat

8  counterintuitively.

9           THE COURT:  It may be both.

10          MR. SHANMUGAM:  Yes, and so this is

11  just an issue that would involve sorting out what

12  the allegations are and applying the litigation

13  privilege.  And that is why we are not arguing

14  before this court affirmatively that this court

15  could affirm the dismissal of all of the state law

16  claims in their entirety based on the litigation

17  privilege.

18          The only claim that unambiguously

19  would fall under the litigation privilege is the

20  straight up fraud claim which is obviously a purely

21  misstatement based claim.

22          THE COURT:  Short of a disciplinary

23  proceeding, is there any remedy that could be had

24  if your client has done the things that are alleged

1  of it?

2              MR. SHANMUGAM:  Courts that have

3  extended the litigation privilege to fraud claims,

4  and there are courts outside New Jersey that have

5  done so, have actually relied on the potential

6  availability of disciplinary proceedings as a

7  reason for doing so.  Because after all that

8  remains available --

9              THE COURT:  My question is outside of

10 disciplinary proceedings, is there anything else?

11             MR. SHANMUGAM:  Well, that is I think

12 the principal remedy for conduct that is covered by

13 the litigation privilege because after all the --

14             THE COURT:  Try asking the question a

15 third time and you might get an answer.

16             MR. SHANMUGAM:  Sorry?

17             THE COURT:  I asked him to try asking

18 the question a third time and maybe he would get an

19 answer.

20             MR. SHANMUGAM:  I apologize.

21             THE COURT:  Is there anything else?

22             THE COURT:  Outside of disciplinary

23 proceedings that you know of.

24             THE COURT:  Is there anything else?

THIRD CIRCUIT, 3/13/2014

1            MR. SHANMUGAM:  I think that that is

2    the primary available remedy.  I suppose that --

3            THE COURT:  Right.  But "else" would

4    mean you could have something other than primary.

5    Is there anything else?

6            MR. SHANMUGAM:  There is one other

7    potential remedy but I don't know that it would

8    apply in this context, and that is a claim for

9    malicious prosecution, which has been extended to

10   civil claims as well as criminal claims.  There is

11   obviously a very high bar for malicious prosecution

12   claims precisely out of concern about the potential

13   harassing use of that cause of action.  And so of

14   course you have to show lack of probable cause and

15   the other elements of malicious prosecution.  And

16   New Jersey courts have carved out malicious

17   prosecution claims as sui generis.  But what New

18   Jersey courts --

19            THE COURT:  You don't think that --

20            MR. SHANMUGAM:  And I do want to --

21            THE COURT:  You don't think as a

22   matter of policy that such a rule that would

23   permit the making of fraudulent statements in

24   the course of litigation would encourage lawyers

THIRD CIRCUIT, 3/13/2014

```
 1  to make such --
 2              MR. SHANMUGAM:  Well, keep in mind,
 3  Judge --
 4              THE COURT:  -- deceptive or misleading
 5  statements during litigation?
 6              MR. SHANMUGAM:  -- Fuentes that the
 7  litigation privilege originally arose as a matter
 8  of common law, as a privilege that applied to
 9  defamation claims, which after all is a species of
10  intentional tort.  And yet defamatory statements
11  made in litigation have always been protected.
12              I think those courts that have clearly
13  extended the litigation privilege to fraud have
14  done so I think precisely because there really
15  isn't a lot of --
16              THE COURT:  I want you to finish your
17  answer, but when you get to the end of your answer,
18  put an answer in there, okay?  I'm waiting to hear
19  a yes or no in response to Judge Fuentes' question.
20              MR. SHANMUGAM:  I think that there
21  are good policy reasons, so yes, there are good
22  policy reasons to extend the litigation privilege
23  for fraud claims.  And when you look at the New
24  Jersey -- and I think that the New Jersey cases on
```

JAMES DeCRESCENZO REPORTING, LLC

1  this issue really do make clear that the litigation

2  privilege applies expansively.

3              And as my friend, Mr. Assaf, pointed

4  out, although the New Jersey Supreme Court has not

5  specifically applied the litigation privilege to

6  fraud claims, in Loigman and in the prior decision

7  in Hawkins the New Jersey Supreme Court made clear

8  that the litigation privilege really applies

9  without regard to the underlying type of cause of

10 action.

11             And of course when you look at the

12 elements of the litigation privilege they don't

13 take the underlying type of cause of action into

14 account either.  And as Mr. Assaf pointed out,

15 there are numerous cases under New Jersey law, not

16 from the Supreme Court but from lower courts or

17 from federal courts applying New Jersey law, that

18 have applied the litigation privilege to fraud

19 claims.

20             And I think that with respect that the

21 Ruberton case is really on point here.  That was a

22 case involving allegedly fraudulent statements that

23 were made to induce a settlement, and yet the

24 appellate division applied the litigation privilege

1   to the lawyers' conduct in that case.  And so I

2   think with respect that's probably the best example

3   of an actual case where the New Jersey courts have

4   applied the litigation privilege to fraud claims.

5           And I want to say a word about

6   fraudulent concealment, because to the extent that

7   a fraudulent concealment claim could survive the

8   litigation privilege here, we do think that there

9   is really a fundamental pleading defect with

10  plaintiff's claims.  And that really relates to --

11          THE COURT:  Well, we talked about that

12  with Mr. Assaf --

13          MR. SHANMUGAM:  Well, I want to just

14  add two quick points on that, if I may.  And the

15  first is really --

16          THE COURT:  You're tough, Mr. -- you

17  won't answer a question and we can't get you to

18  keep your answers short.

19          MR. SHANMUGAM:  Well, I apologize

20  but --.

21          THE COURT:  But we did really beat

22  that horse into the heavens.

23          MR. SHANMUGAM:  There's a lot to say

24  but I want to say just -- well, let me just say one

THIRD CIRCUIT, 3/13/2014

1  quick thing on this point because I realize that

2  I'm trespassing on the court's time.

3              THE COURT:  No, that's all right.

4              MR. SHANMUGAM:  The plaintiffs here

5  have failed to allege facts indicating that they

6  would have obtained a better result but for the

7  alleged --

8              THE COURT:  I think that's what

9  Mr. Assaf said.

10             MR. SHANMUGAM:  Yes, and I want to

11  point the court to the complaint on this, because I

12  think it's very important that the court review the

13  specific allegations on the fraudulent concealment

14  claim.  And those allegations can be found starting

15  on page 193 of the appendix and running to page

16  201.

17             In those allegations I think that

18  the most that can be said about those allegations

19  is that there is an allegation that the plaintiffs

20  resolved their claims for, quote, nominal or token

21  consideration instead of full, fair and complete

22  compensation.

23             But there really aren't any

24  affirmative allegations that the plaintiffs would

THIRD CIRCUIT, 3/13/2014

1  have obtained a better result.  I think in part

2  that is because of the difficulties of causation

3  with regard to these types of claims  that this

4  court is well aware of and that Mr. Assaf

5  referenced.  But I think in part that is also

6  because of the somewhat unique way in which

7  asbestos claims were resolved, and I think this

8  goes to the question of settlements.

9            Plaintiffs allege, correctly so I

10 think, that settlements in these asbestos cases

11 were aggregate settlements.  Now what that means

12 is that you had a large group of defendants --

13            THE COURT:  We know what aggregate

14 settlement means.

15            MR. SHANMUGAM:  Yes.

16            THE COURT:  We understand your point.

17 We want to take a brief break and then we'll hear

18 from Mr. Tunis.

19            MR. SHANMUGAM:  Okay.  Great.  And can

20 I just say one thing?

21            THE COURT:  No.

22            MR. SHANMUGAM:  Okay.  All right.

23 That's fine.  Well, I'm happy to rest --

24            THE COURT:  I will answer your

THIRD CIRCUIT, 3/13/2014

```
 1   question even if you won't answer ours.
 2               MR. SHANMUGAM:  I'm happy to rest on
 3   my briefs on the Anti-Injunction Act and Article
 4   III.  Thank you.
 5               THE COURT:  Thank you.
 6               RECESS
 7               THE COURT:  We're now I think to
 8   Mr. Tunis.
 9               MR. TUNIS:  Thank you, your Honor.
10               THE COURT:  Thank you.
11               MR. TUNIS:  Eric Tunis of Greenbaum,
12   Rowe, Smith & Davis on behalf of defendant appellee
13   Thomas Halket.
14               I think that the brief exchange that
15   Judge Ambro --
16               THE COURT:  Yes, I was going to ask,
17   maybe you could start there.
18               MR. TUNIS:  What's that?
19               THE COURT:  Maybe you can start with
20   the exchange that Judge Ambro had.
21               THE COURT:  Why are you in this
22   commercial?
23               THE COURT:  Why are you here?
24               MR. TUNIS:  Beats the heck out of
```

THIRD CIRCUIT, 3/13/2014

1   me.  I've been trying to persuade plaintiff's

2   counsel for the longest time to cut my client

3   loose.  I can't come up with a good reason.  And

4   appropriately you ask plaintiff's counsel to

5   provide a reason, and instead of providing a reason

6   I think it was pretty clear that plaintiff's

7   counsel really didn't even know who my client

8   was.  And I say that not to embarrass counsel,

9   but to point out that it underscores the complete

10  indifference that plaintiffs have had toward my

11  client throughout this litigation, notwithstanding

12  the fact that they have refused to voluntarily

13  dismiss him from the case.

14          THE COURT:  Mr. Pollock said that

15  your client was involved in collusion with others

16  to destroy evidence.  That's the allegation.

17          MR. TUNIS:  I understand that's the

18  allegation, but I think that Mr. Pollock's version

19  of the allegations is somewhat informed by the

20  misapprehension that Mr. Halket was working for

21  Engelhard and BASF throughout the litigation.  And

22  in fact that was the allegation that was initially

23  made in the original complaint against Mr. Halket.

24          THE COURT:  But we're just at the

THIRD CIRCUIT, 3/13/2014

1   pleading stage.

2            MR. TUNIS:  I'm sorry?

3            THE COURT:  We're just at the pleading

4   stage right now.

5            MR. TUNIS:  I know, but I'm saying at

6   the initial pleading stage the allegation was that

7   Mr. Halket was an employee of Engelhard during the

8   relevant time period.  And we had to point out, and

9   in fact it's in the record, that Mr. Halket

10  separated from the company in 1986, years before

11  the plaintiffs even filed their lawsuits.

12           So essentially the upshot of the

13  claims against Mr. Halket are that he was involved

14  in a document retention plan which did not affect

15  any asbestos litigation during the time that he

16  was with the company, and in fact presided over

17  one asbestos litigation, the Westfield litigation,

18  which admittedly the so-called inculpatory evidence

19  was presented to the plaintiff.

20           So the only way that the plaintiff

21  even gets to Mr. Halket and tries to bring him into

22  all the other allegations against the remaining

23  defendants is that somehow he can be imputed with

24  the conduct of the other defendants, regardless of

1  how long --

2              THE COURT:  Well, in the brief they're

3  arguing that he was at the --

4              MR. TUNIS:  I'm sorry?

5              THE COURT:  In the brief they're

6  saying he was at Hemstock deposition.

7              MR. TUNIS:  He was.

8              THE COURT:  And arguably gave rise to

9  some kind of duty of disclosure.

10             MR. TUNIS:  He was, and recall, that

11 was the deposition in which Hemstock acknowledged

12 the possibility that there was some kind of

13 asbestos or asbestos-like substance in the talc.

14 So far from being an obstructive act, he was

15 involved at a time when the company was fully

16 forthcoming.

17             It's only what happened later in

18 litigation that was filed years after he left

19 the company that it becomes, the company's conduct

20 becomes even arguably problematic.  But that has

21 nothing to do with him.  He wasn't there.

22             And I have to say that what I've

23 referred to as the complete indifference for

24 Mr. Halket runs through not only the course of this

THIRD CIRCUIT, 3/13/2014

1  litigation where, notwithstanding the fact there's

2  been a demonstration that he was only there in the

3  company for a few years, 28 years ago to be exact,

4  but also throughout the state litigation as well.

5              Never has there been a suggestion

6  Mr. Halket be named as a defendant in the

7  underlying personal injury suits.  He's never been

8  subpoenaed to testify.  And in fact, even after

9  Paduano and in connection with the Sampson case,

10  plaintiffs never subpoenaed my client to testify

11  in what essentially is a proxy for this case.

12             So it's clear that to plaintiffs

13  Mr. Halket is an afterthought, and it may be that

14  they're proceeding against him on the theory that

15  it costs nothing extra to take him along for the

16  ride, but the costs to Mr. Halket are obviously

17  very significant.

18             And leaving aside the conventional

19  costs, he's a practicing attorney.  And we all live

20  on our reputations, and when people, prospective

21  clients are making decisions as to whether to hire

22  him, in this day and age the first thing they're

23  going to do is they're going to Google his name,

24  and among the things that are going to come up in

1  the results is the fact that he's a defendant in a

2  RICO suit.

3          Now, you know, we can parse what that,

4  the implications of that are to, among us lawyers,

5  but to a prospective client there is a real threat

6  of harm.  But I raise this argument not only

7  because I think it's grossly unfair that he's being

8  taken along for the ride, but it also underscores

9  the fact that there's no real case or controversy

10  in this matter.

11          Specifically, plaintiffs have sought

12  solely equitable relief against Mr. Halket, no

13  damages, no legal relief of any kind.  And to the

14  extent that they are seeking equitable relief that

15  applies to him in any way, the effect that it's

16  going to have on the interests of the parties,

17  even if plaintiff is successful in this case, is

18  problematic, to be charitable, because if he is

19  enjoined from asserting issue preclusion defenses

20  or statute of limitations defense or cease

21  misstating the composition of BASF product, in what

22  context is that going to affect the parties, unless

23  there's an actual lawsuit filed --

24          THE COURT:  Well, did you move for --

THIRD CIRCUIT, 3/13/2014

```
 1              MR. TUNIS:  -- in which he's a party
 2   or he's called on as a witness?
 3              THE COURT:  Did you move for dismissal
 4   for lack of subject matter jurisdiction as to him?
 5              MR. TUNIS:  Did I move --
 6              THE COURT:  Did you attempt to move
 7   for subject matter dismissal as to him --
 8              MR. TUNIS:  Well, for failure to state
 9   a claim.
10              THE COURT:  -- if there's no case or
11   controversy.  Okay.
12              MR. TUNIS:  I mean technically it has
13   subject matter jurisdiction in the sense that --
14              THE COURT:  The overall suit does.
15              MR. TUNIS:  -- it's a diversity case,
16   but I made --
17              THE COURT:  Okay.
18              MR. TUNIS:  You know, you can't spend
19   55 pages solely on justiciability.  Yes, I've made
20   extensive motions putting forward many of the same
21   grounds for dismissal as my co-appellees.  But what
22   I think is distinctive about the justiciability
23   case that my client is advancing here today is the
24   fact that there is no purpose in this lawsuit.
```

1  Because even if successful, plaintiffs cannot show

2  likelihood, certainty that it's going to affect the

3  interests of the parties in any way.

4            It's completely contingent on the

5  unlikely event that some day, some way, some

6  plaintiff, it's going to strike them that he has

7  some connection to a stated asbestos case.

8            THE COURT:  Isn't the contention in

9  the complaint that he had something to do --

10           MR. TUNIS:  I'm sorry?

11           THE COURT:  Isn't the contention in

12 the complaint that he had something to do with the

13 destruction of evidence?

14           MR. TUNIS:  No.  No.  Again --

15           THE COURT:  Is this on?

16           MR. TUNIS:  There's so -- allegations

17 against him in the complaint are that before he

18 left he engaged in a document retention plan and

19 that he was involved in the Westfall case.  That's

20 it.  There's no direct allegation --

21           THE COURT:  How is it claimed that he

22 was involved in the Westfall case?

23           THE COURT:  He was an in-house counsel

24 at the time.

THIRD CIRCUIT, 3/13/2014

1    MR. TUNIS:  He was in-house counsel

2  at that time, which explains the reason why he was

3  present at the deposition.

4    THE COURT:  So your argument is that

5  he's in this case because of his status as in-house

6  counsel?

7    MR. TUNIS:  Oh, absolutely.  But his

8  status as in-house counsel, his connection to

9  Engelhard ceased in 1986, again before any alleged

10  misrepresentations were made in plaintiff's cases,

11  before there was any production of documents.  He

12  clearly wasn't involved because those cases were

13  filed after he left.  So --

14    THE COURT:  Maybe Mr. Pollock can

15  clarify that.  Thank you.

16    MR. TUNIS:  I'm sorry?

17    THE COURT:  You answered my question.

18  Thank you.  I thought maybe Mr. Pollock can clarify

19  that.

20    MR. TUNIS:  So again, I mean to me

21  it's a fairly straightforward argument.  What

22  effect, ultimately, is the outcome of this case

23  going to have on the interests of the parties?

24  And I suggest it's way hypothetical.  It's beyond

THIRD CIRCUIT, 3/13/2014

1  hypothetical; it's unlikely.

2            THE COURT:  Thank you.

3            THE COURT:  Thank you.

4            MR. TUNIS:  If you have any other

5  questions.

6            THE COURT:  No.  Mr. Shanmugam, at

7  great risk to the clock I'm going to give you five

8  minutes to get into the Anti-Injunction Act.  Five

9  minutes, and I'm sure that you will be cognizant of

10 the time, that you will try your best to answer our

11 questions.  If you want to explain them fine, after

12 you answer, but please get an answer out.

13           MR. SHANMUGAM:  I will, thank you, and

14 I will deviate from today's practice by actually

15 obeying the red light, so thank you.

16           THE COURT:  Okay.  Maybe you can

17 deviate from today's practice by answering the

18 questions.

19           MR. SHANMUGAM:  Well, I will do my

20 best, your Honor, as I've done so far.

21           THE COURT:  Okay.

22           MR. SHANMUGAM:  On the Anti-Injunction

23 Act let me go directly to Judge Ambro's question

24 about why Cahill can assert the Anti-Injunction Act

1  because I think you've heard already in broad terms

2  why we think the Anti-Injunction Act applies.

3          I think that the critical point to

4  understand here is that the plaintiffs are seeking

5  an injunction that runs against all of the

6  defendants.  What's a little bit unusual here is

7  that the plaintiffs aren't seeking an injunction --

8          THE COURT:  The question I asked, it

9  was turned around the other way to them, is if --

10  even if they get it how does that really affect

11  Cahill?

12          MR. SHANMUGAM:  Right.  That's right.

13  And as you pointed out Cahill was obviously not a

14  party to any of the prior underlying asbestos

15  suits.  To the best of my knowledge Cahill is not

16  in fact a defendant in any other lawsuit other than

17  this one on this set of allegations.

18          And so the reason that the

19  Anti-Injunction Act is important to the Cahill

20  defendants is because in the event there were

21  subsequent state court lawsuits against Cahill,

22  for instance based on a fraud theory, we would

23  want to be able to assert the preclusive effects,

24  if any, of the prior state court judgments.  And

THIRD CIRCUIT, 3/13/2014

1  to the extent that we would do so we would

2  obviously do so in the context of those state court

3  proceedings.

4           What the plaintiffs here are seeking

5  to do is to essentially tie one hand behind our

6  collective backs by preventing us from asserting

7  certain defenses in that subsequent litigation in

8  the event that it arises.

9           And to the extent that the plaintiffs

10  are invoking the so-called stranger exception to

11  the Anti-Injunction Act, that exception applies

12  only where the party seeking the injunction was a

13  stranger to the underlying state court proceedings,

14  not a case, as here, where the very party seeking

15  the injunction was a party to the prior state court

16  proceedings and is now seeking to avoid the effects

17  of those proceedings.

18           And I would note parenthetically that

19  we haven't had a lot of discussion this morning

20  about Article III, but Article III provides an

21  independent basis for sustaining the district

22  court's denial of injunctive and declaratory

23  relief.

24           THE COURT:  Advisory opinion?

```
 1              MR. SHANMUGAM:  Sorry?

 2              THE COURT:  You mean an --

 3              MR. SHANMUGAM:  Yes.  And under the

 4   principle of Calderon vs. Ashmus, namely that the

 5   relief that the plaintiffs are seeking here is

 6   relief that stops short of fully and conclusively

 7   resolving the underlying dispute between the

 8   parties.

 9              Now I would note parenthetically on

10   this issue, just one further point, and that is

11   that the plaintiffs through Mr. Pollock point to

12   the allegation in the complaint that involves the

13   maintenance of a trust containing the relevant

14   underlying documents.

15              I believe it's paragraph 16(h) of

16   the amended complaint.  And I think that that

17   is actually relief that would not raise an

18   Anti-Injunction Act problem but would raise an

19   Article III problem precisely because again it is

20   relief that stops short of fully and conclusively

21   resolving the underlying controversy.  The

22   underlying controversy obviously being the asbestos

23   claims that the plaintiffs are seeking to pursue

24   against the defendants.
```

```
 1            THE COURT:  Again you have a situation
 2   where you're arguing the cart before the horse.
 3   They're arguing well it's a Catch-22 because
 4   without the trust we can't proceed in these other
 5   matters that may be out there.  And you're arguing
 6   without some kind of underlying case or
 7   controversy, to use the language of our Article
 8   III, there's no jurisdiction in the federal court
 9   to set up a trust.
10            MR. SHANMUGAM:  Well, at the risk of
11   mangling your metaphor, Chief Judge McKee, I think
12   all we're --
13            THE COURT:  No problem.
14            MR. SHANMUGAM:  -- arguing is that
15   they need to go back to the stable.  They need to
16   go back to the state courts in question to the
17   extent that they want to reopen the judgments.
18   And obviously they remain free to go back to those
19   courts in the event that they want to pursue claims
20   against Cahill as well.
21            And to the extent that we were talking
22   earlier about the defects in their pleading
23   concerning fraudulent concealment and some of these
24   other claims, those defects I think flow directly
```

1  from the fact that the plaintiffs here are seeking

2  to proceed on a class-wide basis.

3          So when you look at those paragraphs

4  on fraudulent concealment that I pointed you to

5  earlier and you kind of scratch your head and you

6  wonder well why didn't they allege more about why

7  they would have obtained a better result in

8  settlement?  You know, wouldn't it be easy for them

9  to so allege?

10          I think the answer is they wanted to

11  maintain their ability to proceed on a class-wide

12  basis.

13          And while it may be true that in other

14  contexts it would seem plausible to be able to

15  allege, well, if we'd only known this information

16  we would have obtained a better result, the very

17  unusual nature of asbestos litigation with

18  aggregate settlements where you're getting just

19  a single check in response to your claims,

20  underscores that it is not self-evident that if

21  they had known that BASF's products contained

22  asbestos, as plaintiffs undisputably knew with

23  regard to other defendants in the asbestos

24  litigation, that they would in fact have obtained

1  a better result.

2             And so all of this sort of relates to

3  the fact that these are all consequences --

4             THE COURT:  It's not self-evident but

5  it is intuitive.

6             MR. SHANMUGAM:  It is?

7             THE COURT:  Intuitive.

8             MR. SHANMUGAM:  I don't think that

9  it is intuitive simply for the reason that you

10 had these settlements even with defendants whose

11 products reportedly did contain asbestos.  And

12 there's no allegation that the settlements were

13 somehow larger as a result of that fact, given

14 that these were aggregate settlements and not

15 settlements with individual defendants.

16            Thank you, your Honors.

17            THE COURT:  Well done.  Perfectly

18 timed.  Mr. Pollock, there's a lot to chew on

19 there.

20            MR. POLLOCK:  Brief rebuttal, your

21 Honor.

22            THE COURT:  Maybe you can start out,

23 and I had mentioned to you initially the case in

24 controversy issue.  The one, candidly the part of

1   your anti-injunction dodge, if you will, and I
2   don't mean that pejoratively, but it's obviously
3   a real problem here.
4           The part of it that struck me as
5   being on the most solid footing was looking at this
6   not in terms of an injunction precluding them from
7   raising certain defenses, but looking at it in
8   terms of getting an order that what happened here
9   was fraud.  And I asked you why is that not an
10  Article III problem.  I think I put it to you in
11  terms of why isn't it an advisory opinion.
12          And the issue just came up again.  And
13  let me go back to it.  Why would that not be an
14  advisory opinion?  Because at that point nothing
15  would be pending.  As I understand it, you would
16  take that judgment, if you were to get it, and use
17  that, let's assume not against the Jersey and Ohio
18  plaintiffs here because then you're back into
19  possibly the Anti-Injunction Act although I
20  understand your argument that you're not because
21  the state court can either agree with it or reject
22  it.
23          But clearly as to the other
24  outstanding class action plaintiffs that may be out

1  there for asbestos, you would use it against them.

2  But we would be issuing a judgment, a declaratory

3  judgment, if you will, at a time when there's no

4  underlying case or controversy, wouldn't we?

5           MR. POLLOCK:  If a case has already

6  been adjudicated then, under Atlantic, then

7  obviously we are now telling that court to change

8  its mind, that would violate the Anti-Injunction

9  Act, I agree.

10          But there are -- if the fraud claims

11  has not been adjudicated -- if the fraud claim --

12  there are currently pending actions.  There are

13  hundreds of cases one counsel currently said that

14  are currently pending.  Why would this court not

15  by the same coin, for at least those cases, have

16  the right to render a ruling and say yes, there

17  was fraud.

18          And at that point the court would want

19  to protect its judgment, it would not want to have

20  another reliti --

21          THE COURT:  Those cases that are out

22  there don't constitute a case in controversy before

23  this court.

24          MR. POLLOCK:  Those cases are part of

THIRD CIRCUIT, 3/13/2014

1  this action though.  Those cases -- the class would

2  encompass all of these cases.  So it may not apply

3  to everybody but it would certainly apply to some.

4  In short, it would apply to some of the actions,

5  perhaps not all.

6             THE COURT:  Well, all you need is one

7  to get past that Article III problem.

8             MR. POLLOCK:  That's right.  Can I

9  answer real quickly?  I notice my red light just

10 went on, but I just --

11            THE COURT:  You may have noticed that

12 we haven't been really paying a great deal of

13 attention to it.

14            MR. POLLOCK:  I just don't want to

15 overstay my welcome before the court.

16            THE COURT:  Okay.

17            MR. POLLOCK:  With regard to

18 Mr. Halket, I believe counsel misspoke.  He has

19 been deposed.  He has been questioned.  It is a

20 confidential proceeding, unfortunately, and I'm not

21 allowed to disclose to this court the nature of the

22 testimony, but he was questioned point blank.  So

23 the statement that he was not questioned is simply

24 untrue.

```
1            The allegation is set forth in
2   paragraph 41.  And Mr. Halket isn't just some guy.
3   He is the guy who was in charge of litigation at
4   BASF at the time that they were destroying, they
5   were going through the great purge of records.  And
6   he is the guy who oversaw it.  He was in charge of
7   litigation at that point in time.  So --
8            THE COURT:  But the claim was that
9   someone else gave the order to sequester that
10  evidence, right?
11           MR. POLLOCK:  That may be true but the
12  allegation is certainly this is a conspiracy too.
13  He has never disavowed the conspiracy, Judge Ambro,
14  therefore since he's never come clean the
15  conspiracy is ongoing under that theory alone.
16           So I just want to say that as to
17  Mr. Halket there's a reason he's there.  Is he
18  the most culpable figure?  No.  But he is certainly
19  a relevant figure because he was the one who was
20  involved at the point in time, in charge of
21  litigation, making decisions through BASF as part
22  and parcel of the conspiracy to purge the records.
23           THE COURT:  Based on what you have so
24  far it sounds like he may have just been at the
```

THIRD CIRCUIT, 3/13/2014

```
 1  wrong place at the wrong time.
 2              MR. POLLOCK:  It could well be, but
 3  the fact is he was not a passive figure like a
 4  paralegal or secretary.  He was a decisionmaker at
 5  the company and the act was a wrongful act as we've
 6  alleged in paragraph 41.  I just want to make one
 7  last point with regard to Loigman, which we spent a
 8  great deal of time on.
 9              Does it make a difference to the
10  court, and this is an honest question, does it
11  make -- hopefully my others weren't dishonest.
12  The question is that I misspoke earlier.  I believe
13  I said that they said there's no evidence --
14  there's no asbestos in our talc.
15              That's not what they said.  What they
16  said is there is no evidence of asbestos in our
17  talc.  And the question is is that a difference
18  that makes a difference?  No asbestos in our talc
19  as opposed to no evidence of asbestos in our talc.
20              And I raise that point simply because
21  in our business we rely upon the representations of
22  counsel all the time.  We rely upon discovery, et
23  cetera.  And so to me it raises a problem under
24  Loigman, is it really meant to cover fraud, the
```

1  question that Judge Fuentes raised earlier, but is
2  it also meant to be a blanket cover for the fact
3  that if I say there's no evidence of this, don't
4  bother pursuing that discovery and rely upon it,
5  that raises to me a potentially different problem.
6        Lastly with regard to our --
7        THE COURT:  But in any case you're
8  saying there's clearly scienter, as to both
9  statements there's scienter.
10       MR. POLLOCK:  Correct.  I think that's
11 absolutely right.  And I'll close on this point, of
12 course unless -- and you've been very patient as a
13 tribunal, I appreciate it.
14       The last point I would raise is, I
15 respectfully disagree that we didn't spell out in
16 volume, I look at Williams at paragraph 19 and I
17 look with regard to -- bear with me for one second,
18 my eyesight is failing me, Chernick at paragraph
19 34.  In both of those we said, in short, and we
20 have the attachments going to the record, that they
21 dismissed those claims cheaply because they didn't
22 get the truth.
23       And apparently counsel wants us to
24 go farther and say and I would have gotten a buck

THIRD CIRCUIT, 3/13/2014

1  50, I would have gotten 200.  The problem is since

2  you've destroyed the evidence and you keep it and

3  hide it from me, pretty tough for me to then go

4  through and plead with more specificity and

5  quantify exactly what I've lost.  But we've

6  articulated everything we could have.

7           And I don't think Iqbal and Twombly

8  meant to make pleading into a game.  I think the

9  purpose was to do exactly what the trial court's

10 supposed to do, is serve as a gatekeeper, keep

11 bogus complaints out, hold our feet to the fire,

12 make sure we properly plead facts.

13          This is a 120 something page complaint

14 in detail.  As to these two people and as to the

15 others we did plead with all particularity we can.

16 To require more would be to say you can never do it

17 unless you actually look under the hood and get the

18 destroyed evidence.

19          Unless you have any further questions,

20 your Honor.

21          THE COURT:  I think Judge Ambro has a

22 couple questions.

23          THE COURT:  I just want to ask if

24 counsel could prepare memoranda, probably no more

THIRD CIRCUIT, 3/13/2014

1   than ten pages, maybe to submit by the end of next

2   week, ten pages double spaced I should say; can a

3   choice of law analysis be waived.  And if it cannot

4   be, what would be New Jersey's choice of law with

5   respect to the litigation privilege issue.

6               MR. POLLOCK:  Your Honor, it will be

7   done.

8               THE COURT:  And you don't have to do

9   that.

10              THE COURT:  You remind me of the kid I

11  sat next to in third grade, he was always trying to

12  get out of homework.

13              THE COURT:  As they say in South

14  Philly, he just done good.

15              Anyway, those two.

16              THE COURT:  We would like to get a

17  transcript of this, and you can see Ms. Ayala about

18  how -- that's not Ms. Ayala.  See our crier about

19  how that would be paid for.

20              MR. POLLOCK:  Your Honor, thank you

21  for your courtesies and your patience.

22              THE COURT:  I think it's a very

23  difficult, obviously very -- it was all important

24  but incredibly complicated, more complicated than

THIRD CIRCUIT, 3/13/2014

1  most, and counsel were very good.  It's a pleasure

2  to have a case like this argued by such competent

3  attorneys because it makes our job easier.

4          Even though I gave you a very

5  difficult time Mr. Shanmugam, I muddle your name, I

6  mumble it because I won't get it right if I say it,

7  but counsel presented very excellent argument which

8  would be helpful, so thank you.

9          MR. POLLOCK:  Thank you, your Honor.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    CERTIFICATION

2

3           I, JAMES DeCRESCENZO, a Registered

4   Diplomate Reporter, Certified Realtime Reporter,

5   Certified Shorthand Reporter of New Jersey, License

6   Number XI 00807, and Notary Public, hereby certify

7   that the foregoing is a true and accurate

8   transcript.

9

10          I further certify that I am neither

11  attorney nor counsel for, not related to nor

12  employed by any of the parties to this action; and

13  further, that I am not a relative or employee of

14  any attorney or counsel employed in this action,

15  nor am I financially interested in this case.

16

17

18  _____

19
    James DeCrescenzo
20  Registered Diplomate Reporter
    Certified Shorthand Reporter Notary Public
21

22

23

24

JAMES DeCRESCENZO REPORTING, LLC